CAPITAL BRIDGE COMPANY, A CORPORATION, DOING BUSINESS AS CENTURY BRIDGE LUMBER COMPANY, APPELLEE, V. COUNTY OF SAUNDERS, APPELLEE, GLENN MELSON, A TAXPAYER, APPELLANT.

83 N. W. 2d 18

Filed April 19, 1957. No. 34005.

*Myrl D. Edstrom,* for appellant.

*Howard V. Kanouff, Woods, Aitken & Aitken,* and *George W. Haessler,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is an appeal from a judgment for the plaintiff against the county of Saunders for $4,832 for bridge lumber sold to the county. The appeal was taken by a taxpayer who alleges that the lumber was delivered as the result of two orders each of which was in excess of $500 and therefore contrary to the provisions of section 39-810, R. R. S. 1943, which requires purchases in excess of $500 to be let to the lowest responsible bidder.

The amended petition of the plaintiff sets forth 11 causes of action, each based on a separate order for bridge lumber. Each cause of action is similar except for the order date and the amount claimed as the fair and reasonable value of the lumber furnished. The dates and amounts set out in the 11 causes of action are as follows: May 27, 1943, $483.60; June 4, 1954, $485.69; June 7, 1954, $496.01; June 11, 1954, $489.60; June 14, 1954, $464.10; June 18, 1954, $497.76; June 21, 1954, $448.80; June 25, 1954, $485.34; June 28, 1954, $328.32; June 30, 1954, $326.39; and July 2, 1954, $326.39. The plaintiff prayed for judgment in the amount of $4,832 with interest and costs.

The answer filed by the taxpayer alleges that the board of supervisors did not enter into a contract to purchase the bridge lumber for the value of which suit was brought. It alleges further that the lumber was purchased by William Stewart, the highway commissioner of Saunders County, without the knowledge, consent, authority, or direction of the board of supervisors. The taxpayer further alleges that if lumber was delivered to the county it was pursuant to two orders made

by Stewart, each of which was in excess of the amount that could be purchased without advertising for the lowest responsible bidder, and that plaintiff and Stewart deliberately and intentionally represented to the defendant that the 2 orders were 11 separate and distinct purchases to show that such purchases were each in a sum less than $500.

The reply of the plaintiff alleges that Stewart was authorized by the county supervisors to purchase lumber when required or needed in amounts less than $500. Plaintiff further alleges that plaintiff's agent and salesman had been present at regular meetings of the board when Stewart was authorized to make purchases of lumber, that the board of supervisors had paid previous claims for lumber ordered by Stewart, and that the county was estopped to deny liability because of a want of authority on the part of Stewart. Plaintiff alleges also that the amount claimed is less than the reasonable value of the lumber delivered.

Upon the issues thus made, the case was tried by the court, a jury trial having been waived by the parties. The trial court found for the plaintiff in the amount of $4,832 with interest at six percent per annum from September 12, 1954, a total sum of $5,141.50 on the day of judgment.

The action is one at law in which a jury was waived and a trial had to the court. Under such circumstances the findings of the trial court are equivalent to the verdict of a jury. The evidence must therefore be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in plaintiff's favor and it should have the benefit of every inference that can reasonably be deduced therefrom. Wallace v. Insurance Co. of North America, 162 Neb. 172, 75 N. W. 2d 549; Barnes v. Davitt, 160 Neb. 595, 71 N. W. 2d 107.

The evidence sustains the following findings of fact: From May 27, 1954, to July 2, 1954, the plaintiff re-

ceived 11 separate orders for bridge lumber on 11 different days as hereinbefore recited. The orders were signed by Stewart, the highway commissioner for Saunders County, who was orally instructed by the board of supervisors to make purchases for bridge lumber required, but not in excess of $500 at any one time. The evidence shows without dispute that the lumber in question was delivered, retained, and used by the county. All budgetary requirements had been complied with by the board of supervisors and the county had adequate funds on hand and available to pay for the lumber for which the suit was brought.

The basis of the contention of the taxpayer that there were but two orders each in excess of $500 is grounded upon the following factual situation: The first eight invoices bear plaintiff's order No. 1244, and the last three invoices bear plaintiff's order No. 1227. The president of the plaintiff company testifies that it is the bookkeeping practice of the company to give all the orders received from a customer the same order number until all ordered materials have been delivered. After the delivery of all materials on all past orders has been made, the next order received is given a new order number. The method of bookkeeping was fully explained and is shown to be a bookkeeping practice having no relation to the question as to whether or not the customer's orders were in fact one or more separate transactions. The trial court found in effect that there were 11 orders and not 2 under the evidence. Since we are required to give the evidence its most favorable import, the finding of the trial court on this question is conclusive upon this court on appeal.

It is contended that the circumstances surrounding the transactions support a conclusive finding that the orders were made in amounts less than $500 for the fraudulent purpose of circumventing the statute. The evidence does show notations made on orders previously received by the plaintiff from which it might be in-

ferred that some connivance may have existed between the plaintiff and Stewart, the highway commissioner, to avoid the requirements of the statute. These notations, however, were explained in detail by the president of the plaintiff company as informational data for the benefit of plaintiff's clerical employees. The highway commissioner testifies that the county had a continuing need for bridge lumber, that it was hard to get in large quantities because of a threatened strike in the lumber-producing industry, that the price was exceedingly high because of this fact, that the board of supervisors thought it an inopportune time to purchase any considerable quantity of lumber, and that he was directed to buy the lumber as needed in small lots of less than $500 until the market became stabilized and conditions became more normal. He testifies further that he never ordered more than $500 worth of lumber at any one time and that the orders given to plaintiff were for lumber presently needed. He states further that at no time did he ever advise the plaintiff to split orders to keep them under $500 because he never placed an order in excess of that amount. The president of the plaintiff company positively denies that any orders received were in excess of $500 or that any orders were split to make them less than $500. Upon this evidence the trial court found for the plaintiff. We are concluded by the finding of the trial court in favor of the plaintiff on the conflicting evidence as to plaintiff's intent to fraudulently circumvent the statute.

We conclude that the findings of fact made by the trial court which were necessary to sustain a judgment for the plaintiff are sustained by evidence and conclusive upon this court on appeal. It is contended, however, that the evidence is sufficient as a matter of law to show a violation of section 39-810, R. R. S. 1943, and that a recovery of a judgment by the plaintiff is barred for that reason.

The applicable statute states: "The county board

of each county has the power to erect and repair all bridges and approaches thereto and build all culverts and make improvements on roads, the cost and expense of which shall in no instance exceed five hundred dollars. All contracts for the erection or repair of bridges and approaches thereto, for the building of culverts and improvements on roads, the cost and expense of which shall exceed five hundred dollars, shall be let by the county board to the lowest and best bidder. All contracts for materials for repairing, erecting, and constructing bridges and approaches thereto, the cost and expenses of which exceed five hundred dollars, shall be let to the lowest responsible bidder, but the board may reject any and all bids submitted for such materials. Upon rejection of any bid or bids by the board, such board shall have power and authority to purchase materials to repair, erect or construct the bridges of the county, and approaches thereto. * * *." § 39-810, R. R. S. 1943. It is the contention of the appellant that the giving of 11 orders amounting to $4,832 from May 27 through July 2, 1954, by the highway commissioner and their acceptance by the plaintiff is in itself evidence that the county needed lumber in excess of the value of $500 and that, under such circumstances, the statute requires that its purchase should be let to the lowest responsible bidder.

We point out that this statute gives the county board the general power to erect and repair bridges and approaches thereto, build culverts, and make improvements on roads. It is clear therefore that the county board had general authority to purchase bridge lumber for the erection and repair of bridges.

This court has denied recovery in cases where the applicable statute prohibits the making of a contract and avoids the obligation thereof. Village of Bellevue v. Sterba, 140 Neb. 744, 1 N. W. 2d 820; Neisius v. Henry, 142 Neb. 29, 5 N. W. 2d 291; City of Lincoln v. First Nat. Bank, 146 Neb. 221, 19 N. W. 2d 156; Warren v.

County of Stanton, 147 Neb. 32, 22 N. W. 2d 287; Heese v. Wenke, 161 Neb. 311, 73 N. W. 2d 223. In Neisius v. Henry, *supra,* we said: "There is much distinction between a contract with a city which is the result of an illegal exercise of an authorized power and one which is illegal because of a statutory disqualification to make a contract, or to create liability. The former may be ratified or a suit quantum meruit maintained. But where one is prohibited by statute from entering into a contract, and the obligation of the contract avoided for so doing, an action quantum meruit cannot be maintained." This is a correct statement of the law to which we adhere.

But in the present case the statute does not avoid the obligation of a contract made in a manner contrary to the provisions of the statute. In such a situation the rule in this state is: Where a contract has been entered into in good faith by a county, which contract was within the power of the county to make but was void for failure to comply with statutory requirements, an action in quantum meruit for the service performed or the material furnished may be maintained.

In such case the party loses the benefit of his contract and his recovery is limited to the reasonable value of the services performed or the material furnished. O'Neill v. City of South Omaha, 102 Neb. 836, 170 N. W. 174; Stickel Lumber Co. v. City of Kearney, 103 Neb. 636, 173 N. W. 595; Omaha Road Equipment Co. v. Thurston County, 122 Neb. 35, 238 N. W. 919; Western Chemical Co. v. Board of County Commissioners, 130 Neb. 550, 264 N. W. 699; Warren v. County of Stanton, *supra.* We conclude therefore, assuming the correctness of the taxpayer's theory that the statute was not complied with, that the trial court having found that the orders were made in good faith, the failure to advertise for bids renders the contracts void. It is not, however, a bar to an action quantum meruit since the county board has the general power to purchase lumber for the erection and

repair of its bridges. It is not questioned that the county accepted, retained, and used the lumber for the benefit of the county.

The evidence is not disputed that the fair market value of the lumber purchased by the county of Saunders was in excess of the amount claimed by the plaintiff. The plaintiff may not, however, recover in quantum meruit an amount in excess of the contract price even though the contract is void. Warren v. County of Stanton, *supra*. The judgment of the trial court is in accord with this rule.

It is contended that the contracts in the present case were not only void but that the obligation thereof is voided by virtue of sections 23-336, 23-337, and 23-338, R. R. S. 1943. We point out that these sections of the statute relate to contracts which contravene statutory limitations and are outside the scope of the powers delegated to a county. They do not relate to the illegal use of a granted power. In the present case the money to pay for the lumber purchased was on hand, having been properly assessed, levied, and collected. The general power to purchase lumber for the erection and repair of bridges is delegated to the county board, consequently the irregular exercise of the power does not defeat the right to recover quantum meruit for services and material furnished where the transaction was made in good faith. This court has so construed these statutes in Bartlett v. Dahlsten, 104 Neb. 738, 178 N. W. 636. With reference to section 1104, Rev. St. 1913, now section 23-336, R. R. S. 1943, the court in that case said: "It was not the intention of this statute that counties should be denied the exercise of those powers which are found to be necessary to carry into effect a power specially granted. If that were the intention it would in many instances effect a repeal of those very provisions of the statute expressly granting the power, for to take away the means of performance is to destroy the power itself. Such would be the result in this case. The pro-

vision of the statute referred to, we take it, was intended to prevent counties from entering into those contracts, express or implied, and was intended to declare such contracts unlawful, where no statutory authority is to be found justifying the making of such a contract." We concur in the view that sections 23-336, 23-337, and 23-338, R. R. S. 1943, void the obligation of the illegal contract only where the contract is contrary to a statutory limitation, or where there are no funds legally available at the time with which to pay the obligation, or in the absence of a statute expressly authorizing such contract. It has no application where the county has general authority to make the contract but the power has been irregularly exercised.

The findings of fact, which have the effect of a jury verdict, are supported by the evidence. Under the law of this state, as herein stated, plaintiff is entitled to recover quantum meruit, not in excess of the contract price. The judgment of the district court, being in conformity with the foregoing pronouncements, must be affirmed.

AFFIRMED.

SIMMONS, C. J., dissenting.

I dissent.

Because the trial court in its findings of fact and judgment used the one word "plaintiff" instead of "defendant" the court holds that it is powerless to determine the facts, presented by this record, contrary to the determination of the trial court.

By a general finding for the plaintiff the trial court precluded this court from reviewing the facts, save to determine if evidence is sufficient to sustain the finding. Had the trial court found for the defendant, then the plaintiff would have been denied a review of the facts here, save to determine if the evidence is sufficient to sustain the finding.

I submit that the issue of "good faith" upon which this court rests its decision was not an issue before the

trial court and hence was not decided by it. As a corollary to that I submit that the rule stated by the court in its syllabus point No. 1 is the remnant of a series of rules designed to limit the review of appellate courts, substantially all of which have been set aside either by constitutional amendment, statutory enactments, or judicial decisions. The rule now followed has no substantial merit and should be discarded in the light of the demand for full review of causes in this court.

I recognize that when the opinion of this court is filed and becomes final in this case it will be determinative of the cause here presented. It will also state the law generally and the construction of the statutes here involved.

However, the construction put upon the statutes here involved has not been the construction heretofore placed thereon and is contrary thereto.

The Legislature is now left helpless to protect counties or other subdivisions of government from the expenditure of funds under the facts that are shown to have existed here. I shall develop these and related matters in the course of this dissent.

What were the issues? The plaintiff sought recovery on 11 causes of action based on contract, each for amounts less than $500. It sought recovery on the same causes in quantum meruit. We are agreed on that.

The county did not defend this action. It defaulted. Its board of supervisors was directly involved in the fact situation presented. It neither undertook to affirm or deny the liability of the county. Individual members testified as witnesses for the plaintiff. Reference will be made later herein to their testimony. A taxpayer defended the action. He denied generally and as to the issue here pleaded specifically:

"4. That the defendant is not indebted to the plaintiff in the sum of $4832.00, nor in any other amount, for bridge lumber or other materials alleged by plaintiff to have been delivered to defendant pursuant to 'purchases'

made by William Stewart, the Highway Commissioner of Saunders County, between the dates of May 27, 1954, to July 2, 1954, both inclusive; that the Board of Supervisors has never entered into any contract or agreement with plaintiff for the purchase of the bridge lumber alleged by plaintiff to have been delivered to defendant; that any bridge lumber purchased by William Stewart from plaintiff was purchased without the knowledge, consent, authority or direction of the Board of Supervisors; that plaintiff knew, or in the exercise of reasonable prudence should have known, that William Stewart had not been authorized or directed to purchase lumber by the Board of Supervisors.

"5. That if any bridge lumber was delivered by plaintiff to defendant as the result of 'purchases' made by William Stewart between May 27, 1954, and September 2, 1954, it was in fact delivered pursuant to two orders made by William Stewart; that for the purpose of attempting to defeat the provisions of law requiring the Board of Supervisors to let contracts for bridge lumber to the lowest bidder and to enable the plaintiff, with the knowledge and approval of William Stewart, to make claim against the defendant for sums greatly in excess of the market value and in excess of the reasonable value of any bridge lumber delivered and greatly in excess of the sum for which such lumber could have been purchased by bid, the plaintiff and William Stewart have deliberately and intentionally represented to the defendant that the two orders were eleven separate and distinct purchases, that each purchase was for a particular and different job or bridge, and that each of such purchases was for a sum less than $500.00."

Here it should be specifically noted that in its summary of the answer the court does not even mention the allegation "that for the purpose of attempting to defeat the provisions of the law requiring the Board of Supervisors to let contracts for bridge lumber to the lowest bidder," etc.

In reply plaintiff alleged, and I quote the complete reply:

"Plaintiff alleges in reply to paragraph four of said answer that prior to acceptance of the orders for lumber involved herein, the County Board of Supervisors of Saunders County, in regular session, had authorized and directed the purchase of lumber by William Stewart, Highway Commissioner, when required or needed in amounts less than $500.00. *That plaintiff's agent and salesman had* been present at regular meetings of said board, *both before and during* the purchases in issue, when purchases of lumber by said Highway Commissioner, *including purchases herein involved, were reported, discussed and approved* by said Board and the members thereof. That the *members of said Board had knowl-edge* of the purchase, delivery and use of the lumber involved in plaintiff's claims and prior to the purchase of such lumber had approved and paid claims for other purchases of lumber *similarly made* by said Highway Commissioner. That said County had adequate funds available, according to law, for the purchase of such lumber. That by reason of the facts aforesaid, *if any irregularity exists* relative to the contract for purchase of said lumber, the County of Saunders is *estopped* to deny liability in respect of the purchase of said lumber.

"Plaintiff further alleges that, by reason of the facts aforesaid and the allowance of plaintiff's claims, said County of Saunders fully approved and *ratified* the purchase of said lumber from plaintiff.

"For further reply plaintiff denies all of the allegations of paragraph 5 of said answer and alleges that the amount claimed for the lumber involved in plaintiff's claim is actually below the reasonable value of the lumber so sold and delivered." (Emphasis supplied.)

In summary plaintiff in reply pleaded that it had knowledge of the facts of these purchases, for its "agent and salesman" was present when these and prior purchases were "reported, discussed and approved"; and that

the members of the board had a similar knowledge of the facts of these purchases and had paid prior claims. Here the court ignores plaintiff's judicial admission that it was present when purchases of lumber "including purchases herein involved, were reported, discussed and approved." That admission relates not only to the ones here involved but also to other purchases "similarly made" that form the basis of the plea of estoppel and ratification.

What was the defense tendered on that pleading? It was that "by reason of the facts aforesaid" the county was "estopped" to deny liability. The defense of plaintiff was then "estoppel" and ratification. The court, in its opinion, mentions the plea of estoppel—and then pays no further attention to it.

In Anderson v. Anderson, 155 Neb. 1, 50 N. W. 2d 224, we held: "A litigant may not present an issue for determination and avoid the effect of an adjudication or estoppel by withholding proof thereof. * * * Facts alleged in a petition to which the defendant in his answer pleads a waiver, an estoppel, or a matter to avoid, will be treated *as admitted,* though the answer also contains his general denial." (Emphasis supplied.)

In Giacomini v. Giacomini, 163 Neb. 798, 81 N. W. 2d 194, we held: "A plea of estoppel in pais may be joined with a general denial when the averments *by way of estoppel are not inconsistent* with such denial." (Emphasis supplied.)

I submit that the defense and only defense of the plaintiff to the charge of illegality of these contracts was that of estoppel based on the knowledge of the plaintiff *and* the knowledge of the county board. I submit that such a defense is inconsistent with the general denial.

The court in its decision ignores the basic plea of estoppel which the plaintiff asserted as a defense and decides the cause on an issue of good faith. It joined issue generally. However, by pleading the estoppel to avoid the facts which the plea of estoppel presents, the

facts denied generally are to be "treated as admitted" and as "inconsistent with such denial."

Plaintiff in its brief here summarizes the issues presented by the taxpayer in his answer as follows:

"2. Claimant and William Stewart, county highway commissioner, falsely represented there to be eleven orders, where actually all of the lumber was ordered in two orders.

"3. The purchases were separated into eleven orders to defeat the provisions of law requiring the board of supervisors to let contracts for lumber to the lowest bidder."

Plaintiff summarizes its reply as follows:

"1. Prior to acceptance of the lumber orders involved, the board of supervisors, in regular session, had authorized and directed William Stewart, highway commissioner, to purchase lumber when required or needed in amounts less than $500.00.

"2. That plaintiff's agents and salesman had been present at regular meetings of the board of supervisors, when purchases of lumber by the highway commissioner, including purchases herein involved, were reported, discussed and approved by the board of supervisors and the members thereof.

"3. That the board of supervisors had knowledge of the purchases, delivery and use of the lumber involved in plaintiff's claims and prior to the purchase of said lumber had approved and paid claims for purchases of lumber similarly made by the highway commissioner.

"4. That said county hal (sic) adequate funds available, according to law, for purchase of said lumber.

"5. That if *irregularity exists* relative to purchase of said lumber, the County of Saunders is *estopped* to deny liability.

"6. That by reason of the above facts and allowance of plaintiff's claims, the County of Saunders approved and ratified the purchase of lumber involved from the plaintiff."

It will be noted that plaintiff here makes no contention of the issue of good faith upon which the court rests its decision. Its entire summary of the pleadings (except for the general denial) leads to the ultimate defense of estoppel and ratification.

Plaintiff summarized the issues here as follows:

"The real questions in this case are:

"1. Did the lumber orders given by Stewart, under direction of the county board, amount to valid contracts between appellee and Saunders County, either in the first instance or by ratification?

"2. If the power and authority of the county to purchase lumber was irregularly exercised, to the extent that appellee can not recover on contract, is the county liable for the reasonable value of the lumber, in quantum meruit?"

We have held: "Where the record on appeal to this court clearly shows that the case was tried and determined in the court below upon a certain theory, it will ordinarily be considered and decided in this court upon the same theory, even though such theory may be somewhat at variance with the pleadings." Hunt v. Chicago, B. & Q. R. R. Co., 95 Neb. 746, 146 N. W. 986.

We have also held: "An issue not presented in the trial court may not be raised for the first time in the Supreme Court." Freeman v. City of Neligh, 155 Neb. 651, 53 N. W. 2d 67.

Here the issue upon which the court decides the case was not pleaded nor was the cause tried upon that theory.

Able counsel for the plaintiff do not even mention here the rule of law relied on by the court and stated in syllabus No. 1.

Now what about the rule that this being a law action the findings of fact based on conflicting evidence must be accepted here because it is "equivalent to the verdict of a jury."

It is a rule of long standing and repeatedly followed.

We stated it as late as Powell v. Farmers State Bank, *ante* p. 180, 82 N. W. 2d 260.

There are fundamental differences between our consideration of a jury verdict and the consideration of the findings of fact made in a law action by the court without a jury.

One is that if evidence is improperly admitted in a trial to a jury that is prejudicial to the losing party we have the power and duty to reverse.

In a situation where a jury is waived on appeal we review the facts only to find if there was proper evidence to sustain the findings of the trial court, without any way of knowing what evidence the court weighed in coming to its decision.

In a trial to a jury, the court by its instructions puts in writing its theory of the applicable law. On appeal we can reverse if the court's theory of the controlling law is erroneous. We know what it was. Under the rule which we have followed, and which the court now follows here, we have no way of knowing what the trial court's conception of the applicable law may have been. It may have been entirely erroneous. Had the trial court had a correct legal theory in mind, the conclusion of fact might well be different. However, if it led to a conclusion of fact which we can sustain under a correct legal principle then an affirmance is required without regard to what rule the court followed in determining the facts.

The trial court goes from a finding of fact to a conclusion under rules of law. We have no way of knowing, under a general finding, what facts or law the trial court acted upon. We are completely in the dark as to the facts or law that were deemed controlling by the trial court. So we reverse the process and take a proper rule of law and hunt for facts that will sustain the finding.

I have repeatedly voted for opinions based on that rule and no doubt have used it as a ready answer to

problems presented. In my judgment it is fundamentally unsound and should be discarded. This case is a good one to illustrate its fallacies, for a reading of the court's opinion shows that the whole conclusion of the court rests upon the application of the rule of law stated in syllabus No. 1. This presents a good case upon which to investigate the basis of the rule.

The rule, as I understand it, rests in the ancient distinction between the function of trial and appellate courts in that the trial court was a trier of facts and appellate courts dealt with questions of law only and would reverse a fact judgment only for legal errors. But who knows what legal errors were in the mind of a trial court when a general finding of fact only is made without even a finding of a rule of law as a guide to the operation of the trial court's mind?

The rule which the court follows here is a remnant of the old writ of error procedure which presented to an appellate court only questions of law. But the writ of error in civil cases has long since been abolished in this state. § 25-1930, R. R. S. 1943. This provision was first enacted by the Territorial Legislature in 1858. See Code of Civil Procedure, Territorial Laws 1858, section 539. It was reenacted by the Territorial Legislature in 1866. See Code of Civil Procedure, Territorial Laws 1866, section 599.

After statehood, it became section 599 of the Code of Civil Procedure and is found at page 632, G. S. 1873.

Although the writ of error in civil cases has been abolished in this state since 1858, the remnant rule that rests upon that writ remains.

Irwin v. Calhoun & Croxton, 3 Neb. 453, was decided in February 1872. In that decision this court held that there was no appeal in equity cases to this court and that the only method for a review of either legal or equitable actions was by petition in error.

By act effective March 3, 1873, the Legislature provided for appeals in equity. G. S. 1873, p. 716. See

Nebraska Loan & Trust Co. v. Lincoln & B. H. R. R. Co., 53 Neb. 246, 73 N. W. 546.

In Wilcox v. Saunders, 4 Neb. 569, followed in Troup v. Horbach, 62 Neb. 564, 87 N. W. 316, this court held that an appeal brings the whole case to this court for trial de novo. Nevertheless the court continued to apply the remnant writ of error rule even in equity cases. See Gibson v. Hammang, 63 Neb. 349, 88 N. W. 500, where we stated the rule that: "* * * if the evidence is conflicting, or if there is evidence sufficient to sustain the findings of the district court, its determination of questions of fact will not be disturbed, even though we might have reached a different conclusion if called upon to decide such questions in the first instance."

Also see Frerking v. Thomas, 64 Neb. 193, 89 N. W. 1005, wherein we held: "In reviewing a cause on appeal, where the findings and decree of the trial court can not be reconciled with any reasonable construction of the testimony, the same will be set aside as unsupported by sufficient evidence."

I have cited these cases from many that could be cited because they were decided in 1901 and 1902.

In 1903 the Legislature enacted what is now section 25-1925, R. R. S. 1943, Laws of Nebraska 1903, chapter 125, page 631. That act required this court in an equity action to "reach an independent conclusion" as to what findings are required, without reference to the conclusion reached by the trial court even though there be evidence in support thereof.

Nevertheless this court continued to follow the remnant writ of error rule where there was conflicting evidence. However, in these later years we have followed it only in cases of irreconcilable conflict. We have recognized the essential unsoundness of the remnant rule in equity cases and have properly moved to relax its rigors. But it is not so in law actions tried to the court without a jury.

It was provided in the 1875 Constitution that: "The

right to be heard in all civil cases in the court of last resort, by appeal, error, or otherwise, shall not be denied." Art. I, § 24.

The amendment was prompted by the fact that the right of appeal by appeal, error or otherwise had been a statutory right—and had been denied where no statutory authority existed.

Section 583 of the Code of Civil Procedure (G. S. 1873, page 628), provided: "A judgment rendered or final order made by any court, board, or tribunal, mentioned in the preceding sections, may be reversed, vacated, or modified by the supreme court, for errors appearing on the record; but the petition in error, in such case, can be filed only by leave of the supreme court, or a judge thereof."

In State ex rel. City of Lincoln v. Babcock, 19 Neb. 230, 27 N. W. 98, it was held that the effect of the constitutional provision was to repeal so much of section 583 of the then code "as relates to the allowance of a petition in error."

But the remnant rule remained and has been applied without relaxation although it effectively denies a party the right to have a review of findings of fact in a law action tried to the court without a jury except in those cases where he can show that there is no evidence at all to sustain the trial court. In most cases that is no review of fact at all.

Section 584 of the Code of Civil Procedure provided for proceedings in this court by petition in error to reverse, vacate, or modify a judgment of the district court. G. S. 1873, p. 628. This and other provisions were repealed in 1907. Laws 1907, c. 162, p. 495. This section provided for appeals to the Supreme Court in all civil cases. It is now with amendments, section 25-1912, R. R. S. 1943. The "appeal" in civil cases was recognized as a right in Gentle v. Pantel Realty Co., 120 Neb. 630, 234 N. W. 574.

In Hoover v. State, 126 Neb. 277, 253 N. W. 359, we

held that all judgments other than those made felonies or misdemeanors by the criminal statutes "are reviewable by appeal."

Although writs of error in civil cases and petitions in error in civil cases to this court have long since been abolished, nevertheless the remnant rule remains.

By legislative act, often at the suggestion of this court, and by judicial decision, many of the old rules of procedure have been put aside in the interest of removing barriers that prevent a full consideration of a cause here on appeal.

There is no reason, save adherence to an ancient rule, that prevents this court from giving the same full consideration to facts and law in a law action tried to the court without a jury that is presently accorded a litigant in an equity action. It would be an advance in the science of jurisprudence to recognize that fact and have the rule now applicable to appeals in equity actions applicable to law actions tried to the court without a jury.

And now I go to the facts of this case.

The court summarizes the evidence into two pages. I prefer to make a more detailed statement of the evidence which I find in this record coming almost entirely from plaintiff's witnesses and plaintiff's records. Later in discussing the court's conclusions I will restate parts of it.

Prior to the purchases here involved, the county made its last purchase of lumber in carload lots in August of 1953. Thereafter in the fall and winter of 1953-1954 the highway commissioner purchased lumber of plaintiff at different times. These purchases were all invoiced in amounts less than $500 and the claims were allowed by the county. These invoices total several thousand dollars.

The first of this series of invoices is dated November 18, 1953, and the last four are dated February 24, 1954. Unless otherwise stated, all dates hereinafter used are for the year 1954.

It appears that on February 25 the county had a substantial stockpile of lumber on hand. At that time the highway commissioner had calculated the anticipated needs for lumber. At its February 1954 meeting the highway commissioner appeared before the board and asked what they were going to do about obtaining lumber and asked, "Do you want me to work up an invitation to bidders?" He was told to consult with the bridge committee, to buy the lumber as needed, and to stay under $500 in cost amount. Further details as to these instructions will be set out later in this opinion.

Thereafter two invoices dated May 28 were presented to support a claim for $908.29. One invoice refers to 40 pieces, the other to 41 pieces. The invoices describe identical lumber except as to number of pieces. These invoices were paid.

Previous to and thereafter, and dated May 27, June 4, June 7, June 11, June 14, June 18, June 21, June 25, June 28, June 30, and July 2, 11 separate orders were executed by the highway commissioner and delivered to the plaintiff. They are the basis of the claim involved in this litigation.

On June 10 delivery was made to the county at plaintiff's yards of the lumber involved in the first three of these orders.

The orders of May 27 and June 4 contained lumber of identical description, the first order being for 28 pieces and the second for 11 pieces. The orders of June 11, 14, and 18 included a total of 320 pieces of one description of lumber. These 320 pieces were delivered to the county at plaintiff's yards on July 2. There was also delivered at that time 50 pieces of a total of 80 pieces of another description which had been included in the orders of June 14, 18, 21, and 25. Thereafter on July 9 there were delivered to the county 30 additional pieces of the same description of lumber that was delivered in part on July 2, There were also delivered 14 pieces of another description, 5 of which had been ordered on

June 25 and 9 on June 28. There were also delivered 14 pieces of another description, 7 of which had been ordered on June 30, and 7 on July 2.

The lumber so delivered to the county was taken to its yard and placed with other lumber in the stockpile there, from which it was later removed and used as the county's needs required.

There was no record made of the board's decision of February 1954 directing the highway commissioner to purchase bridge lumber as needed and in amounts of less than $500 in value. It is patent from the record here that the chairman of the board gave the instructions and that it was concurred in by other members of the board. The highway commissioner testified that the board assented. It is also patent that the instructions were repeated from time to time.

The chairman of the board fixes the time of the instructions to the highway commissioner as in February or March 1954. The chairman on direct examination testified that he told the highway commissioner "he better keep them in less than $500 lots to comply with the law." The chairman testified:

"Q  In other words, if he needed $900 worth of lumber he was to order it in two orders so that neither order would be over $500, is that correct?

"A  Well, I suppose. I instructed him to keep it under $500.

"Q  And the reason for doing that, Mr. Hanson, was to avoid the provision of the statute which says that when it runs over $500 you are supposed to call for bids, isn't that true?

"A  No, we didn't do it to avoid; we did that to comply with the law was my idea, trying to comply with it.

"Q  In other words, you figured that *if you broke the need for $900 into two orders you were complying with the law?*

"A  *That's what we thought, yes."* (Emphasis supplied.)

The highway commissioner testified: "And they told me to buy lumber as we needed it as it come up in amounts of less than $500, and to contact the bridge crew and get their authority as to when to buy it—or the bridge committee."

The highway commissioner further testified that *one* of the reasons why he ordered as he did was to comply with his instructions to keep the orders under $500. It is patent that he complied with his instructions.

The plaintiff's president testified that he often attended the board meetings and knew the highway commissioner had been ordered to purchase lumber as needed. He personally handled some of the orders involved in this claim. He testified that he did not know that he heard "any such conversation" about keeping the orders under $500.

Part of the records of the handling of these purchases prior to those involved in this claim are in evidence.

The method of handling these orders intraoffice as testified to by plaintiff was in general as follows: When an individual order was received, it was given an order number. It was then held and, as additional orders were received, it was given the same order number as the first. That same order number was used until the material ordered was delivered. So at least, for bookkeeping purposes, the accumulated orders were treated as one entire order for the material delivered. Then a new order number was given to a succeeding order and the same procedure followed. Individual invoices were then made based on the material in each individual order and as such submitted to the county to support a claim for the entire amount. That procedure was not followed in these claims and invoices.

The invoices dated July 2, 6, 9, 10, 13, 14, 16, and 18, 1954, bear "Our Order No. 1244." The last three dated July 19, 22, and 23, 1954, bear "Our Order No. 1227."

These invoice dates are not related either to the date on the order or the date of deliveries. As above pointed

out, this lumber was delivered on June 10, July 2, and July 9, 1954. The material involved in the order of May 27 was invoiced, dated July 19. The order of June 4 was invoiced, dated July 22. The order of June 7 was invoiced, dated July 23. The order of June 11 was invoiced, dated July 2. The order of June 14 was invoiced, dated July 6. The order of June 18 was invoiced, dated July 9. The order of June 21 was invoiced, dated July 10. The order of June 25 was invoiced, dated July 13. The order of June 28 was invoiced, dated July 14. The order of June 30 was invoiced, dated July 16. The order of July 2 was invoiced, dated July 18. The invoice dated July 18, 1954, is shown as verified before a notary public on that date. July 18, 1954, was a Sunday. The evidence does not show that plaintiff was transacting business on that date.

I go now to some of the earlier orders and their handling as taken from plaintiff's records. On October 6, 1953, is shown an order for 85 pieces 3″ x 12″ x 16′ material. This bears a notation, "Okayed by Stewart phone," (Stewart being the highway commissioner). On October 9, 1953, "Phone by Stewart" is shown on order for 65 pieces 3″ x 12″ x 16′ of the same material. On October 14 an order is shown for 150 pieces 3″ x 12″ x 15′ of the same material. It bears the writing, "Invoice in amounts of less than 500.00 per order," and below that, *"Separate Invoices,"* and two orders shown for 85 and 65 pieces, respectively. This has the endorsement, "Okayed by phone Stewart." The writing quoted above as to invoicing less than $500 per order was placed there by a *salesman of plaintiff* who explained by saying that the board chairman "would say not to go over five hundred dollars for any material * * *." Dated January 27, 1954, is shown an order for 80 pieces 3″ x 12″ x 16′ fir plank. A like order the following day calls for 70 pieces of the same material. On January 29, 1954, 150 pieces were delivered to the county at one time. The same day an office order was prepared by one of plain-

tiff's employees calling for 150 pieces. Below that is written, "Invoice in amounts of less than 500.00 as below" and *"Make Separate Invoices."* Below that are entries of two separate orders, one for 80 and one for 70 pieces. It is noted that the instructions were not to invoice as per each order but to invoice for less than $500.

The record shows that on January 29, 1954, the county made a separate order for 30 pieces of 3″ x 12″ x 18′ lumber. On January 30, 1954, 12 pieces of 6″ x 16″ x 24′ were ordered. January 31 was a Sunday. February 1, 1954, 75 pieces of 2″ x 12″ x 16′ were ordered. On February 1, 1954, that lumber (plus 32 pieces of 3″ x 12″ x 18′) was delivered to the county. On the same day an office order was prepared for the total of this delivery with the notation, "* * * Make Separate invoice for each item."

On April 21, 1954, there was a consolidated order made out by a salesman for 120 pieces of 3″ x 12″ x 22′ material. It bore the notation, "Bill under $500.00 See attached," written by the salesman. Attached were separate orders signed by the highway commissioner dated April 16, 19, and 21, 1954.

Plaintiff's president testified as to an intimate knowledge of the transactions of this business and that he quite often went over the invoices before they went out. He testified that the plaintiff had a very good reason for making these notations on the office-prepared orders, saying, "we had been warned several times that a competitor of ours was going to tie up our funds in Saunders County, and I wanted to be very sure that I could give him no reason to tie up our funds in Saunders County."

That is the story of the system of handling purchases and sales initiated in 1953 by the highway commissioner and the plaintiff. It shows that when the board, in February 1954, informally instructed the highway commissioner to make purchases in amounts of less than $500 in value, that that action was only directing him to con-

tinue to purchase as had been theretofore done. It shows also that plaintiff's officers, employees, and salesmen knew what was being done, why it was being done, and cooperated fully in the execution of the plan.

Two other matters should be mentioned. There is no claim here that any of the orders involved were in the nature of emergency orders. Rather the orders were made to keep the county stockpile of lumber reasonably adequate for needs that might arise.

There is considerable evidence in the record that in the late spring of 1954 there were stories of an expected strike of labor in the lumber-producing regions of the Pacific Northwest. That strike became effective in the summer of 1954. However, there was no strike or threat of a strike when this plan of making purchases and sales was devised in 1953. The chairman of the board testified that he had no knowledge of a pending strike when he first gave the highway commissioner the order to buy under $500 in cost in 1954. This situation is advanced as a reason for buying in small quantities. There is evidence that lumber of the kind here involved could not be purchased in carload lots during this period of 1954. We find no evidence of an attempt to buy lumber in quantity at any time after 1953 in compliance with the statute.

The court states that the evidence shows facts as to orders previously received "from which it might be inferred that *some connivance* may have existed between the *plaintiff* and Stewart, the highway commissioner, to avoid the requirements of the statute." (Emphasis supplied.) Webster defines connivance as "passive cooperation, as by consent or pretended ignorance, especially in wrongdoing." I accept the definition. I point out, however, that the connivance, the cooperation in wrongdoing by the plaintiff that was involved in the "orders previously received," was by judicial admission in the plaintiff's reply carried forward into the 11 orders here involved. That was a necessary admission as a

foundation for the plea of estoppel and ratification.

But it need not rest on a judicial admission alone. Plaintiff's evidence and records establish the fact that the conniving was a continuing process reaching into the orders here involved.

Why were the pleadings so drafted? It appears without dispute from plaintiff's records that beginning in the fall of 1953 these orders were being split, consolidated in the plaintiff's office at times and at times by the salesmen, and after delivery of the lumber, invoices in less than $500 based on the split orders were filed and claims paid. These facts were not of record in the county offices. The claims were filed so as to conceal those facts. In February of 1954 the highway commissioner at a regular meeting of the board asked for instructions as to whether he was to "work up an invitation to bidders." He was told to buy in small lots as lumber was needed "in amounts of less than $500." It was at that meeting that the board, as a board, had knowledge of what was being done and approved its continuance. Hence the plea of plaintiff's knowledge "both before and during the purchases" which were "reported, discussed and approved" by the board. To give any validity to the plea of estoppel it was necessary to bring that knowledge home to the board. Hence the plaintiff pleaded its own knowledge, the knowledge of the board, and the payment of claims with that knowledge.

What is the evidence that relates this conniving to the orders here involved? The court says that Mr. Stewart, the highway commissioner, was directed to buy "in small lots of less than $500 *until* the market became stabilized and conditions became more normal."

I quote the exact testimony of plaintiff's witnesses both as to the directions and the reasons given:

Mr. Hanson, plaintiff's witness, and chairman of the board, testified:

"Q  Now, you testified on direct examination that you

instructed Mr. Stewart to keep the orders below $500, didn't you?

A I did.

Q In other words, if he needed $900 worth of lumber he was to order it in two orders so that neither order would be over $500, is that correct?

A Well, I suppose. I instructed him to keep it under $500.

Q And the reason for doing that, Mr. Hanson, was to avoid the provision of the statute which says that when it runs over $500 you are supposed to call for bids, isn't that true?

A No, we didn't do it to avoid; we did that to comply with the law was my idea, trying to comply with it.

Q In other words, you figured that if you *broke the need* for $900 into two orders you were complying with the law?

A That's what we thought, yes." (Emphasis supplied.)

Mr. Stewart, the highway commissioner, testified as to the making of these orders. He was asked and answered as follows:

"Q Isn't it true, Mr. Stewart, that on May 27th, 1954, you could just as well have ordered all of the lumber that you ordered June 4, 1954?

A I could have. It might not have been available at the time.

Q And that the *only* reason you didn't order it was to comply with Mr. Hanson's instructions to keep the orders under $500, isn't that true?

A I wouldn't say that was the *only* reason. There may have been other reasons why it wasn't ordered." (Emphasis supplied.)

The court states: "The president of the plaintiff company *positively* denies that any orders received were in excess of $500 or that any orders were split to make them less than $500" and that the trial court was justi-

fied in holding that plaintiff had no "intent to fraudulently circumvent the statute."

The court finds evidence of conniving as to the earlier transactions, but finds none as to those here involved. The only difference between the two in this regard is that the earlier claims were paid, while those here involved were not.

Now what is the evidence as to the knowledge of the plaintiff's president and as to participation in the conniving as to these orders here involved? The plaintiff's president, Mr. Ward, testified as to full knowledge of all these transactions. The plaintiff's pleadings admit it.

Four of the orders involved in this litigation were taken by Mr. Ward, plaintiff's president. The remaining seven orders were taken by Mr. Morrissey, a salesman for plaintiff.

The conclusion to buy in amounts less than $500 was openly arrived at, so far as the witnesses reveal, at a regular board meeting in February 1954.

Mr. Ward testified that he made regular visits to Wahoo as a salesman; that he was present at board meetings four or five times during the time this lumber was being purchased when lumber needs were discussed and when Mr. Stewart was instructed to purchase lumber; that all orders taken by him were obtained in the courthouse; and that he overheard the conversations about the purchase of lumber and the directions to buy. He sustained the allegations of plaintiff's reply.

He was then asked and answered:

"Q Now, did you hear any talk about keeping the orders below $500?

A *I don't know that I heard any such conversation. I simply heard a direction to buy lumber.*" (Emphasis supplied.)

That is the extent of his positive (?) denial. He does not deny knowledge of what was being done.

I find no direct evidence that Mr. Ward was present at the February 1954 meeting when this plan of pur-

chase was openly stated. He puts himself at several of the meetings. Mr. Stewart testified that he might have been there and that he or some other salesman might have been there. Mr. Stewart three times avoided answering whether or not he had told Mr. Ward or any representative of the plaintiff about his instructions to buy in amounts of less than $500. *Mr. Ward denied only to the extent that he did not remember any conversation with them about splitting orders.*

We now go to the testimony of Mr. Morrissey, the salesman who obtained the balance of the orders involved in this litigation. He was present in the courthouse and heard conversations between Hanson and Stewart regarding the purchase of lumber.

Under date of April 16, 1954, Mr. Stewart signed an order for 39 pieces of lumber, under date of April 19, 1954, there was an order for 40 pieces, and under date of April 21, 1954, there was an order for 41 pieces, or a total of 120 pieces of exactly the same description of lumber at a price of $1,345.61.

These appear on a consolidated order form for 120 pieces below which is written by Morrissey: "Bill under $500.00. See attached." Attached are the delivery sheets showing delivery at *one time* and Mr. Stewart's separate orders. The consolidated order is signed by Mr. Morrissey, the salesman, and bears the annotation that it was "okayed" by the board of supervisors, which was written by Mr. Morrissey.

An order taken by Morrissey on October 14, 1953, shows a total of 150 pieces ordered—stricken out— and "Separate Invoices" written in, making it into two orders. This shows "Okayed by phone Stewart." Mr. Morrissey testified it was a phone call. Yet attached to it are two separate orders "Okayed" by Stewart "by phone."

Other orders were similarly handled. They show inescapably that Mr. Morrissey was taking the split orders, consolidating them to submit to the plaintiff, getting their approval in consolidated form by the board, and

that he was doing it so as to keep all orders under $500 and obviously doing it with knowledge of the plan that was being followed.

It is in evidence that the invoices involved in these claims were "proofread" by Mr. Ward. He knew what was going on. If this record does not establish knowledge on the part of the plaintiff, then it is futile for anyone ever to attempt to show knowledge. In fact it goes further and shows a full cooperation in the procedure by which evasion of the law was carried out.

I readily concede that most of the direct evidence of the conniving relates to previous transactions that had been paid. But it was all one plan, all carried out in the same way by the same officers and the same salesmen. The fact that the earlier claims had been paid does not wash out all of the correlated executed plan to "avoid the requirements of the statute."

The court states that the taxpayer's contention that there were but 2 orders in excess of $500 (and not 11 orders under $500) is based on the fact that the first 8 invoices bear No. 1244 and the last 3 invoices bear No. 1227. That is an understatement "more than slight," to use a comparative negligence expression.

The above is but one single fact among the many that is the basis of the taxpayer's contention.

The explanation given by plaintiff's president and accepted by the court is that orders are held and given a consolidated number when deliveries are made and then subsequent orders receive a new number. What is the evidence?

The invoices that bear order No. 1244 are dated July 2, July 6, July 9, July 10, July 13, July 14, July 16, and July 18, 1954. The invoices that bear order No. 1227 are dated July 19, July 22, and July 23, 1954. The earlier No. 1227 is on the latter invoices and the later No. 1244 is on the earlier invoices so far as dates of invoices are concerned.

The lumber involved in the invoice dated July 2, 1954,

bearing order No. 1244 was delivered July 2. The lumber involved in the invoice dated July 6 bearing order No. 1244 was delivered July 2. The lumber involved in the invoice dated July 9 and bearing order No. 1244 was delivered July 2. The lumber involved in invoice dated July 10 and bearing order No. 1244 was delivered July 2. The lumber involved in invoice dated July 13 and bearing order No. 1244 was delivered July 9. The lumber involved in an undated invoice but "date shipped" July 14, bearing order No. 1244, was delivered July 9. The lumber involved in invoice dated July 16 and bearing order No. 1244 was delivered July 9. The invoice dated July 18, bearing order No. 1244 (for an *identical* amount of lumber as that invoiced on July 16), was delivered on July 9, 1954. The lumber involved in invoice dated July 22, 1954, bearing order No. 1227, was delivered June 10. The lumber involved in invoice dated July 23, bearing order No. 1227, was delivered June 10.

The above analysis of the invoices shows that the orders bearing No. 1227 were delivered June 10. That fits plaintiff's explanation of its bookkeeping practices. The first four invoices bearing order No. 1244 were delivered July 2. That fits plaintiff's explanation of its bookkeeping practices.

The next four invoices bearing order No. 1244 were delivered July 9. *That does not fit into plaintiff's explanation of its bookkeeping practices.* Yet the court does not mention it and holds that the trial court could properly accept plaintiff's statement although it was directly contrary to the undisputed records made by the plaintiff at the time. The court finds no inference of conniving from the above facts from plaintiff's records as to the transactions here involved. But let's go further.

In the above I have been talking about invoice dates and order numbers. I now repeat a paragraph from my *statement* of the facts which shows the *dates* of the *orders* and the dates of delivery and their lack of any

relationship to the *dates* of the *invoices*. The court does not mention this evidence.

As above pointed out, this lumber was delivered on June 10, July 2, and July 9, 1954. The material involved in the order of May 27 was invoiced, dated July 19. The order of June 4 was invoiced, dated July 22. The order of June 7 was invoiced, dated July 23. The order of June 11 was invoiced, dated July 2. The order of June 14 was invoiced, dated July 6. The order of June 18 was invoiced, dated July 9. The order of June 21 was invoiced, dated July 10. The order of June 25 was invoiced, dated July 13. The order of June 28 was invoiced, dated July 14. The order of June 30 was invoiced, dated July 16. The order of July 2 was invoiced, dated July 18. The invoice dated July 18, 1954, is shown as verified before a notary public on that date. July 18, 1954, was a Sunday. The evidence does not show that plaintiff was transacting business on that date.

The evidence of the notary, an employee of the plaintiff, is undisputed that the affidavit as to date of that invoice is false.

These invoices are the only records that appear in the county's records. The evidence of their falsity is in the plaintiff's records and was dug out and produced by the taxpayer. Why were these false dates made on the invoices? Was it a good faith act or a conniving act?

Mr. Ward, president of the plaintiff company, testified that it was his practice to examine and approve these invoices. The record was in his office in connection with these invoices that showed on their face what was being done. Mr. Ward in explaining some of these matters said that they had very good reason for doing what was done because they had been warned that a competitor was going to tie up their funds and wanted to give him no good reason for doing so. What did he have to fear except the knowledge of the way these orders had been split in their inception with the "intent to fraudulently circumvent the statute"?

Plaintiff in its brief here says that the "dates of invoices are not evidence of bad faith," and that the fact that one invoice was dated on Sunday was an immaterial "office error." Are they evidences of good faith? Neither the plaintiff nor the court seems to think so. Possibly one "office error" of a date would not be material but these 11 falsely dated invoices go beyond that to a designed plan to conceal and to connive. The court neither explains, justifies, or excuses these matters. It ignores them. However, they are a part of the undisputed story of the conniving.

On the evidence set out by the court it finds that there is evidence to sustain a finding that there were 11 orders and not 2 orders involved and that there was evidence to sustain a finding that there was no intent to fraudulently circumvent the statute. The court holds that the "findings of fact made by the trial court" are "conclusive upon this court on appeal."

The trial court made no such findings. This court makes the findings fitting them into the trial court finding for "the plaintiff and against the defendant." The trial court did not even find whether recovery was to be had on contract or on quantum meruit. The findings made here are those which this court conceives the trial court might have found.

On this record to me the conclusion is inescapable that orders for lumber were split into small orders for the purpose of bringing the cost of each order within the statutory limit of $500. The parties say so. Plaintiff's records prove it. The invoices filed with the county do not reveal that fact. It is patent that the concealment was intentional. In view thereof I would find the judgment of the trial court is clearly wrong even under the court's rule of law as stated in syllabus No. 1.

It occurs to me that if the facts are that there were 11 contracts all for less than $500 and were good faith contracts, that that would end the matter and that plaintiff would be entitled to recover on contract under sec-

tion 39-810, R. R. S. 1943. But the court does not rest the decision on that ground.

It goes to a determination of whether the evidence is sufficient as a matter of law to bar recovery under the statute.

The evidence which the court states in this connection is evidence which the court has just put aside as beyond the reach of its consideration under the jury rule.

The court then quotes all but the concluding sentence of section 39-810, R. R. S. 1943. I shall refer to that sentence later herein.

The court then holds that the "statute gives the county board *general power* to erect and repair bridges" etc., and that the county board has *"general authority* to purchase bridge lumber for the erection and repair of bridges." (Emphasis supplied.) Up until this opinion was filed that has not been the law. The court states the rule that recovery is denied where the applicable statute prohibits the making of a contract and avoids the obligation thereof.

The court does not analyze the statute nor refer to our decisions. I suggest that if the court is right that the statute can stand the test of analysis.

The first sentence of section 39-810, R. R. S. 1943, is: "The county board of each county has the power to erect and repair all bridges and approaches thereto and build all culverts and make improvements on roads, *the cost and expense of which shall in no instance exceed five hundred dollars."* (Emphasis supplied.) That sentence is a grant of power limited to a cost of not to exceed $500. It is not a general power as the next provision indicates. The third sentence is: "All contracts for materials for repairing, erecting, and constructing bridges and approaches thereto, the cost and expenses of which exceed five hundred dollars *shall* be let to the lowest responsible bidder, * * *." (Emphasis supplied.) That is a mandatory provision. It is a grant of power on condition, not a general power. It attaches to and is a

part of the power itself. In Cheney v. County Board of Supervisors, 123 Neb. 624, 243 N. W. 881, with reference to this statute we held: "The statutory language is clear that, where the cost and expense involved 'exceed five hundred dollars,' contracts relating to the following subjects *must* be entered into by county boards in compliance with its terms, viz., contracts for (1) erection and reparation of bridges and approaches thereto; (2) for building of culverts; (3) making improvements on public roads; (4) for furnishing materials in connection with the same." The mandatory "shall" is used in the statute. We construed it using the mandatory "must."

In People ex rel. Putnam and George v. Commissioners of Buffalo County, 4 Neb. 150, we stated this rule: "Whenever a statute requires the performance of an act for the sake of justice or the public good, the word 'may' is the same as 'shall' and imposes a positive and absolute duty." We have consistently adhered thereto down to and including State ex rel. Cashman v. Carmean, 138 Neb. 819, 295 N. W. 801. The statute, then, so far as above quoted, imposes an absolute duty on the county to contract in that manner and that manner only. To imply a power to contract otherwise would be to make compliance with the statute an optional act.

Any question as to that conclusion is removed by the remainder of the sentence just quoted from the statute and the succeeding sentence. It is: "* * * but the board may reject any and all bids submitted for such materials. *Upon rejection* of any bid or bids by the board, such board *shall* have power and authority to purchase materials to repair, erect or construct the bridges of the county, and approaches thereto." Obviously the only time that the board has the general power to let contracts without competitive bidding for materials in excess of a $500 cost is after a bid or bids have been received and rejected. The concluding sentence is, *"All* bids for the letting of contracts *must* be deposited with

the county clerk and opened by him in the presence of the county board, and filed in the clerk's office." (Emphasis supplied.) This is the sentence which the court does not quote. That provision requires the bids to be a matter of public record. Obviously no compliance with that provision has been made as to the contracts here involved.

The court ignores and reads out of the statute everything following "The county board of each county has the power to erect and repair all bridges and approaches thereto and build all culverts and make improvements * * *."

In Neumann v. Knox, 115 Neb. 679, 214 N. W. 290, we had before us a comparable statute applicable to cities and villages. The statute there involved was section 4180, Comp. St. 1922, as amended by Laws 1925, c. 51, § 1, p. 202, which provided that contracts for works to cost more than $500 should not be entered into "without advertising for bids." We enjoined a contract not so let. We also held: "It is evident that the legislature was intending to protect the citizens of cities and villages in the expenditure of their moneys by their officials, and also to protect the taxpayer from possible venality of the officials and prevent them from entering into improvident contracts for work or improvements, of the cost of which they might not be well advised."

Other courts have considered cases based on similar statutory provisions and under contentions such as the plaintiff makes here. Those courts have denied the existence of a general power and denied recovery.

In 10 McQuillin, Municipal Corporations (3d ed.), § 29.33, p. 279, there is this statement: "In some jurisdictions, the necessity of competitive bidding depends on the amount involved in the contract to be let. If applicable, such a requirement must be observed in good faith by the acting municipal authorities. And where a municipality is prohibited from letting contracts involving an expenditure of more than a specified sum

without submitting the same to competitive bidding, it cannot divide the work and let it under several contracts, the amount for each falling below the amount required for competitive bidding." Ellis v. City of New York, 1 Daly (N. Y.) 102, is cited to sustain the text. In that case Keyes had a contract for certain curb and gutter work. He made claim for additional work not covered in the contract which he performed at the direction of the street commissioner. The work involved several parcels of work which was ordered done at one time and as continuous work. The commissioner had no authority to contract work costing more than $250 without authority of the council and then only to the lowest bidder. Plaintiff claimed less than $250 for each parcel of work. The court denied recovery and held: "To hold, as the plaintiff's counsel contended on the argument, that the wall thus built being in four detached pieces, should be considered as four separate and distinct employments, each under $250, would be to declare in effect, that a positive prohibition in the charter might be *evaded and nullified by a plan so simple that it could scarcely be considered as rising to the dignity of a trick;* as I can hardly imagine any work required by the corporation to be done, that could not thus be divided into parts sufficiently small as to make the expense of doing each part come within the prohibition. The plaintiff's contract, even, would have been unnecessary, and indeed the entire streets of the city might be paved by the Street Commissioner without contract and without subjecting the work to public competition, if such a palpable violation of the law as is shown in the present case should be allowed to prevail." (Emphasis supplied.)

The plain meaning and intent of the holding is quite applicable in the instant case.

In 63 C. J. S., Municipal Corporations, § 996, p. 567, the rule is stated as follows: "Where a statute, charter, or ordinance requires advertising and public bidding, a municipal contract made in violation or evasion of these re-

quirements, and not within the terms of a special exception, is generally invalid and imposes no obligation or liability on the corporation * * *."

A case cited there is that of Wing v. City of Cleveland, 9 Ohio Dec. (Reprint) 551. In that case city officials were proposing to purchase material in violation of a statute which, among other things, required that all contracts exceeding $500 be awarded to the lowest and best bidder and have the approval of the council. An injunction was issued restraining the execution of the contract. The amount involved was $3,800. The officials then divided the purchase and made contracts so that no purchase exceeded $500. This was done by four resolutions passed at three different times. They were cited for contempt for violation of the injunction. It was contended that, having divided the purchase into quantities of less than $500, there was no violation of the injunction or statute. The court held: "It is very difficult for me to understand how anybody could have supposed that was a fair compliance with the provisions of this statute. It would be a very brief way of repealing this statute and setting it entirely at defiance. * * * it is impossible to reach any other conclusion in this case, than that these acts are wholly unlawful * * *." The court held that a "parceling" of the purchase was "a direct violation" of the statute.

State ex rel. Butler v. Dugger, 172 Tenn. 281, 111 S. W. 2d 1032, is quite comparable to the instant case. There a contract had been entered into with a bus operator to transport school pupils for $100 per month. The relator performed service under that contract for some time. It appears to have been determined, without litigation, that the contract was illegal because of a statutory requirement that such a contract, where the cost exceeded $100, should not be entered into until there had been advertisement and bids and then to the lowest bidder. In the course of the opinion the court held that the $100-a-month contract was illegal as a preliminary

finding to a decision of the case. Relator discontinued performance. The board then, pursuant to a resolution, entered into a contract with relator to operate the bus for $5 a day, payable weekly. Relator performed service for 9 days. The action involved an attempt to recover $45. The court held that the $5-a-day contract was a "patent effort" and an obvious attempt to evade the requirements of the statute. In the course of the opinion the court referred to Savage v. Macadam Co., 5 Tenn. App. 377. There macadam had been purchased at different times for the repair of streets, the aggregate purchases exceeding $500. Contracts involving more than $500 were to be let by public bidding. The court said: "It did not appear in that case that an undertaking which would necessarily involve the expenditure of more than $500 was purposely split up in order to avoid the charter limitations." Recovery was denied.

People ex rel. Whitlock v. Lamon, 232 Ill. 587, 83 N. E. 1070, is a comparable case. There the statute required all contracts for the construction of sidewalks where the expense exceeded $500 to be let to the lowest responsible bidder. The city desired to construct a sidewalk in front of contiguous lots in a block. The cost of the sidewalk in front of all the lots exceeded $500. The cost of the sidewalk in front of each lot was less than $500. The city entered into separate contracts with the same contractor for the sidewalk in front of each lot without any attempt to comply with the statutory requirement. The court denied recovery, holding: "No reason is suggested and no explanation is attempted by appellee for splitting up this improvement into four separate contracts. The reason for the course pursued is apparent. It is manifestly a mere shift for the purpose of evading section 7 of the sidewalk statute. If the method pursued by the city is sustained, section 7 of this statute will be rendered nugatory. If the sidewalk in front of each lot is to be regarded as a separate and distinct improvement it

would probably never happen that the cost of construc-
ing a sidewalk in front of a single lot would exceed
$500. Under appellee's contention a sidewalk extend-
ing the entire length of a street may be constructed at
a cost of many thousand dollars and a private contract
entered into for the entire work. The only thing nec-
essary to evade the statute is to execute a duplicate
contract for that portion of the walk in front of each lot."

Bigham v. Lee County, 184 Miss. 138, 185 So. 818, in-
volved a statute that required competitive bidding for
the purchase of supplies except that in cases of emer-
gency, purchases could be made for sums less than $100
under certain circumstances. Without competitive bid-
ding a supervisor purchased lumber totaling $613.62.
No emergency existed. The purchases were for the
repair of bridges. Bills for the lumber were submitted
so that none of the itemized accounts would exceed
$100. In denying recovery the court held that the
manner of making the contracts "was a plain evasion
of" the statutory requirements, and "The manifest pur-
pose of the statutes is to safeguard public contracts;
and to secure competitive bids from parties interested,
to secure to the public fair contracts, and the advantages
of competition."

But the court concludes that regardless of the "gen-
eral power" the plaintiff cannot recover on contract for
it concludes that "plaintiff is entitled to recover quan-
tum meruit, not in excess of the contract price." This
is based on the theory that "the county has general au-
thority to make the contract but the power has been ir-
regularly exercised." Here the court shifts from its
conclusion that the evidence sustains a recovery on
the basis of valid contracts and hence is an action in
contract and proceeds to its ultimate conclusion that the
contracts are void, but that recovery can be had quantum
meruit.

This conclusion proceeds on two conclusions. The vio-
lations were irregularities and the statute does not avoid

the obligations of the contract. I shall discuss these contentions separately.

What is the "irregularity"? The obvious answer is the failure to comply with the terms of the statute. But the evidence as to the failure to comply has all been put aside by the court.

I again point out that in Cheney v. County Board of Supervisors, *supra*, we construed the statute here involved, using the mandatory "must be" complied with. We denied an injunction there, not because of an irregular exercise of the power, but because under the *facts* of that case the statutory restrictions in section 39-810, R. R. S. 1943, were not applicable to the work involved. Clearly under that opinion had the litigation involved "bridges and approaches" the injunction would have been granted. The court makes no reference to this opinion.

In Hunt v. Fenlon, 313 Mich. 644, 21 N. W. 2d 906, the court had litigation which involved the construction of a statute which required competitive bidding on all contracts involving an expenditure of $500 or more. The court followed its earlier decision in City of Saginaw v. Consumers Power Co., 213 Mich. 460, 182 N. W. 146, and held: " 'That a provision requiring competitive bidding is mandatory, that the municipality is not bound by contracts made in defiance of it, finds support in the great weight of authority and is in accordance with the holdings of this court.' " It cited with approval the text from 44 C. J., Municipal Corporations, § 2490, p. 324 (now 63 C. J. S., Municipal Corporations, § 1148, p. 811).

In State ex rel. Whedon v. York County, 13 Neb. 57, 12 N. W. 816, the statute required bids to be let on or before January 1 of each year and the letting of bids to the lowest competent bidder. A contract was let to one not complying with the terms of the statute. An unsuccessful bidder brought an original action in this court to compel the awarding of the contract to him on

the ground that he was the lowest bidder. We issued the writ, holding: "While the presumption is that the defendants acted in good faith in letting the contract in the manner they did, the statute points out their duties and the manner of performing the same, and this mode is exclusive."

The rule is stated as follows: "The purpose of a statute requiring the letting of bids to the lowest bidder is to invite competition, and to that end publicity of the intention to let the contract is of the essence of the proceeding. Hence, any statutory provisions requiring advertisement, or specifying its nature, are usually to be regarded as mandatory, and a failure substantially to comply with their requirements is sufficient to avoid the contract." 2 Dillon, Municipal Corporations (5th ed.), § 809, p. 1219.

I would hold that the statutory provisions of section 39-810, R. R. S. 1943, are mandatory and exclusive.

My objection to the quantum meruit rule as stated goes to its application here where it is resolved into a "heads I win, tails you lose" rule.

The court holds the county liable for the reasonable value of the material delivered under a procedure that in nowise complies with the mandatory statutory power of the board to purchase materials.

It does not appear that this fact and law situation has ever been decided by us. Other courts have considered and determined a contention of the right to recover reasonable value. We go now to those decisions, pointing out that they sustain a denial of recovery either on contract or quantum meruit.

The taxpayer cites Johnson County Savings Bank v. City of Creston, 212 Iowa 929, 231 N. W. 705, 84 A. L. R. 926. The facts are in part found in Jackson v. City of Creston, 206 Iowa 244, 220 N. W. 92. There the city council entered into four contracts for street improvements with one contractor. They were identical contracts except that each referred to a different street

to be improved. The contracts were let without competitive bidding. In the first case the court enjoined the levying of assessments and the issuance of bonds. In the second case the attempt was to establish the liability of the city upon the contracts and alternately for the value of the work done.

The defense was that there was in fact but one contract, divided into four contracts for the purpose of avoiding a budget law requirement that contracts to cost $5,000 or more required the adoption of plans and specifications, proposals for contract notice, and hearing. The contracts were entered into without submission to competitive bidding. The statute requiring competitive bidding was held to be "preemptory." The court held: "The statute is a prohibition upon letting such contracts in any other mode. * * * It is a general principle that a municipal contract entered into in violation of a mandatory statute, or a contract in opposition to public policy is not merely voidable but void * * * and that no contract for services rendered or goods furnished pursuant thereto can be implied, nor may the acceptance of benefits thereunder be made the basis of a liability by estoppel. * * * Municipal corporations are the creatures of the legislature. They have such powers to contract, and only such powers, as the legislature grants to them. When the legislature withholds power to contract, or permits the exercise of the power in a given case only in accordance with imposed restrictions, the corporation may no more bind itself by implied contract than by the forbidden express contract. All persons dealing with a municipal corporation are charged with notice of the limitations upon its power. Those limitations may not be exceeded, defeated, evaded or nullified under guise of implying a contract. A municipal contract let without competitive bidding when the statute requires competitive bidding, is void, *and no recovery may be had either upon the purported express contract or upon an implied contract to pay the*

*reasonable value of the services or material furnished thereunder.* * * * A meeting of the minds is as essential to the existence of a contract implied in fact as it is to an express contract. * * * Manifestly the making of a contract may not be implied in a case in which an express contract is forbidden. * * * 'it is fundamental doctrine that a contract which is violative of public policy is void and will not be enforced.' * * * To sustain the plaintiff's contention would be to permit one to obtain from a municipality an illegal contract for doing work impossible of return and by performing it enable him to recover the reasonable value of the services and materials furnished—to nullify the law by evasion and indirection and to recover the value of work done under a contract which the law prohibits." (Emphasis supplied.)

I have omitted the citations of authorities found in the opinion. The court distinguished cases which involved the "irregular exercise of conferred power" which did not involve the "total absence of power, or the exercise of assumed power in defiance of the express command of the legislature."

In Tobin v. Town Council of Town of City of Sundance, 45 Wyo. 219, 17 P. 2d 666, 84 A. L. R. 902, recovery was sought for the balance due for street improvements performed under a written contract. The defense was that the contract was void because of the amount involved and the failure to comply with a requirement to let the contract to the lowest bidder. The court held the contract to be void, relying on 2 Dillon, Municipal Corporations (5th ed.), § 801, p. 1197; 44 C. J., § 2185, p. 100; 3 McQuillin, Municipal Corporations (2d ed.), § 1283, p. 849; and 19 R. C. L., § 356, p. 1068. It then held that provisions such as were contained in its statutes "from the standpoint of both reason and authority alike, may not be regarded lightly and as merely formal and unimportant matters. They appear in those statutes generally, throughout the several states of the Union, which control the action of state and municipal officers who are

charged with the duty of expending public funds for necessary improvements, material, services, and the like. Unquestionably, they were devised and are so inserted to prevent favoritism, corruption, extravagance, and improvidence in the procurement of these things for the use of the state and its local self-governing subdivisions. Provisions of this kind must be so administered and construed as fairly and reasonably to accomplish their vitally important purpose. *Only by sternly insisting upon positive obedience thereto as mandatory provisions of law* have the courts found that the policy they uphold may be maintained. We deem it unwise to relax this policy, concededly an extremely valuable safeguard to the taxpayers of the municipalities of this state." (Emphasis supplied.)

The court then went to the contention of ratification, estoppel, and implied contract for the work and materials furnished. The court held: "Contentions of this character have been urged upon the courts of this country in a vast number of cases and, while in some jurisdictions there may be found decisions which support them, our search and study of the matter has led us to the conclusion that the weight of authority and reason alike is with that line of cases which decline to allow contentions of this character to succeed.

"Mr. McQuillin, in his work on the law of municipal corporations, has very well summarized his survey of the legal principles bearing on these points as follows:

" 'The doctrine which seems to harmonize with our governmental and legal system, which appears to be supported by reason, and which, therefore, should prevail may be thus stated briefly: If the charter or the statute applicable requires certain steps to be taken before making a contract, and it is mandatory in terms, a contract not made in conformity therewith is invalid, and ordinarily cannot be ratified, and usually there is no implied liability for the reasonable value of the property or services of which the municipality has had

the benefit. These provisions exist to protect the citizens and taxpayers of the municipality from unjust, ill considered, or extortionate contracts, or those showing favoritism, and if the municipality is suffered to disregard them and the other contracting party is, nevertheless, permitted to recover for the property delivered or the services rendered, either on the ground of ratification, estoppel or implied contract, then it follows as the night the day that the statute or charter provision can always be evaded and set at naught. Cases holding the contrary are usually based on the idea that it is unjust for a municipality to receive and accept the benefits of a contract and then turn around and defend an action to recover the contract price or the reasonable value, on the ground that the contract was not entered into as provided by statute or the charter, but it should be remembered that the other contracting party is charged with notice of the provisions of the statutes or charter in regard to contracting, and that the welfare and protection of the taxpayers and residents of the municipality is of more importance than the dispensation of justice to a private party in a particular case.' 3 McQuillin, Municipal Corporations (2nd Ed.), § 1266, p. 798-9.

"The same author further says, in Sec. 1283 of the volume last cited:

" 'The prevailing rule undoubtedly is that if the powers of a municipality or its agents are subjected by statute or charter "to restrictions as to the form and method of contracting that are limitations upon the power itself, the corporation cannot be held liable by either an express or an implied contract in defiance of such restrictions." '

"And in Sec. 1358 following appears this language:

" 'A municipality cannot be estopped to aver its incapacity to make a contract by receiving benefits thereunder. That is, it cannot be made liable either on the theory of estoppel or implied contract, where it had no

capacity to make the contract or where it was made in express violation of law. * * *

" 'A contract which violates an express provision of the law cannot be ratified, e.g., one not awarded by competitive bidding, as required, or one that must be upon a consideration wholly to be performed after the making of the contract, and to be in writing. Such invalid contracts cannot be ratified after performance.' "

The court then cited with approval and quoted from Johnson County Savings Bank v. City of Creston, *supra;* Frisbie Co. v. City of East Cleveland, 98 Ohio St. 266, 120 N. E. 309; and Bartlett v. City of Lowell, 201 Mass. 151, 87 N. E. 195. It denied relief to the plaintiff.

In Bechtold v. City of Wauwatosa, on rehearing, 228 Wis. 559, 280 N. W. 320, a contract for paving was held void because of failure to comply with a statute with reference to bids and the letting to the lowest responsible bidder where the estimated cost exceeded $500. The court held: "* * * a municipality has no power to make contracts for public improvements unless it proceeds in the manner prescribed by law, and that a contract entered into without complying with the charter provisions is void. * * * a contract void in its inception is not validated by performance and remains a void contract." The court further said that a failure to comply with every incidental provision of a statute might not necessarily invalidate a contract but "a failure to comply with those provisions which are essential to the accomplishment of the legislative purpose are in a different category."

The above decision was followed by Federal Paving Corp. v. City of Wauwatosa, 231 Wis. 655, 286 N. W. 546, where an attempt was made to recover the reasonable value of the paving. The court held: "(2) A municipality does not become liable for money, goods, or services upon principles of unjust enrichment where it is prohibited from contracting in any other than a specified way, as for instance, with the lowest bidder.

\* \* \* (4) Where the municipality has power to do an act or enter into an obligation and is not prohibited from creating a liability in any but a specified way, it may become liable upon principles of unjust enrichment for moneys had and received, for services rendered, or for goods furnished. This is the converse of the situation set forth in (2), and relates to a situation where there is no prohibition against the creation of a contract in the way that it was sought to be created. \* \* \* (8) Where the statute forbids the making of the contract by a municipality and the other party, the contract is illegal and there shall be no recovery upon principles of unjust enrichment."

The court then discussed certain authorities and continued: "Summarizing very briefly, it is evident that in many fact situations there is no good reason why a municipal corporation should avoid the duty of paying for benefits conferred in good faith under merely void or irregular contracts, and the courts have tended to impose this duty where the case involved nothing more than this. Where, however, the situation is that outlined in the following quotation from Woodward, Quasi-Contracts, p. 261, § 161, the great weight of authority denies a recovery in restitution:

" 'If the irregularity is such as to deprive the municipality of the protection of a safeguard against the extravagance or corruption of its officers—as a substantial failure to comply with a requirement that contracts shall be let to the lowest bidder after due publication of notice—recovery should be denied.'

"The matter is thus put in Restatement, Restitution, p. 241, § 62: 'A person otherwise entitled to restitution of a benefit conferred by mistake is disentitled thereto if restitution would seriously impair the protection intended to be afforded by common law or by statute to persons in the position of the transferee or of the beneficiary, or to other persons.'

"One of the illustrations to this section is as follows,

p. 243:   'In state X .a statute provides, that no contract for work to be done for a municipality where the contract price exceeds $10,000 shall be made unless it has been passed upon at regular session of the municipal council duly called.  A contracts with the city of Y for dredging for the price of $50,000, the contract being approved only by the municipal officers.  Upon completion of the work, A is not entitled to reasonable compensation from Y although he believed that the council had approved the contract or although he did not know of the statute.'

"* * * however harsh the result may appear to be, the decisions are sound in principle if there is to be effective enforcement of mandatory statutes and avoidance of the circumvention of statutory prohibitions. This principle also makes impossible application of the doctrine of estoppel as a means of binding a municipality. Where creation of a contract in any but a specified way is prohibited, the city may not by waiver, ratification, or acts ordinarily amounting to an estoppel give vitality to the prohibited contract or become bound upon the principles of restitution."  Recovery was denied.

In conclusion on this feature of the case I refer to our decision in Fairbanks, Morse & Co. v. City of North Bend, 68 Neb. 560, 94 N. W. 537.  There the plaintiff had made a bid for public improvements accompanied by a deposit of $200 to be forfeited if plaintiff failed to enter into the contract.  As the situation developed we held that the bid was made on a proposal that was without compliance with the statute requiring advertising for bids.  The plaintiff, refusing to enter into the contract, sued to recover the amount of the deposit.  We held that the statute was mandatory, and that neither party was estopped to deny the legality of the proceedings.  We permitted a recovery of the deposit on the theory that the parties had stopped short of the consummation of an illegal contract.  We stated the rule that "* * * where one of the parties to an

illegal contract pays money thereon to the other, he may recover it back before the contract is executed, but not afterwards."

The reasoning threaded through all of these decisions is that if recovery is allowed on implied contracts that the salutary purposes of the statutes requiring competition and bidding on contracts of this character would be defeated and a mandatory statute, in effect, nullified.

And yet the court allows recovery "quantum meruit not exceeding the contract price."

That is done on the theory that the statute does not avoid the obligation of a contract made in a manner contrary to the provisions of the statute.

I have cited the mandatory provisions of the statute and the repeated decisions holding that such a statute makes the contract void and denying recovery either on quantum meruit or on contract.

But there is such a statute. It is sections 23-336, 23-337, and 23-338, R. R. S. 1943. The court cites it but does not quote it nor analyze it. It provides: *"All contracts, either express or implied,* entered into with any county board, for or on behalf of any county, and all orders given by any such board or any of the members thereof, for any article, service, public improvement, material or labor *in contravention of any statutory limitation,* or when there are, or were no funds, legally available therefor, or in the absence of a statute expressly authorizing such contract to be entered into, or such order to be given, are hereby declared unlawful and shall be wholly void as an obligation against any such county." § 23-336, R. R. S. 1943. (Emphasis supplied.)

"Any public official or officials who shall audit, allow or pay out, or cause to be paid out, any funds of any county for any article, public improvement, material, service or labor, contrary to the provisions of section 23-336, shall be liable for the full amount so expended, and the same may be recovered from any such official

or the surety upon his official bond by any such county, or any taxpayer thereof." § 23-337, R. R. S. 1943.

"*No judgment shall hereafter be rendered by any court against any such county* in any action brought to recover for any article, public improvement, material, service or labor contracted for or ordered in contravention of any statutory limitation, or when there are or were no funds legally available at the time, with which to pay for the same, or in the absence of a statute expressly authorizing such contract; Provided, that this section and sections 23-336 and 23-337 may not prevent the repairing of any bridge damaged by sudden casualty, when the county board shall first declare that an emergency exists, and give notice of its intention to repair such damage by at least one publication in some newspaper of general circulation in the county." § 23-338, R. R. S. 1943. (Emphasis supplied.).

The court says that statute relates to contracts "outside the scope" of delegated powers; it does "not relate to the illegal use of a granted power"; and "has no application where the county has general authority to make the contract but the power has been irregularly exercised."

The court here relies for its sole authority upon Bartlett v. Dahlsten, 104 Neb. 738, 178 N. W. 636. That was a claim by a physician based on contract to recover for services rendered in an emergency. Recovery was permitted *in part*. The authority for the decision rested upon the powers granted to county boards and state boards of health in the prevention of contagious diseases. The statute was then sections 2737 and 2738, Rev. St. 1913 (now as amended sections 71-501 and 71-502, R. R. S. 1943).

An examination of the statute reveals that as to the county it is one of general authority to counties to prevent contagious diseases. There is one exception to which I shall refer presently. There were no limitations, conditions, or provisos attached to the power.

The provisions as to the state Board of Health are of like general import. We held in the Bartlett case that while there was no provision in the act providing for the charging of expenses, "that liability must necessarily be inferred." The court then referred to section 1104, Rev. St. 1913 (now section 23-336, R. R. S. 1943), and questioned whether it "has any bearing on this case." It then used the language quoted herein by the court.

What application does it have here? The court there said that where there was a general power to do certain acts, liability to pay the expenses of exercising the power would be inferred. It is only by resorting to the general power construction of section 39-810, R. R. S. 1943, that this case can have any application at all. I have explored, and I think exploded, the general power construction of section 39-810, R. R. S. 1943. None of the provisos, conditions, or limitations, or "musts" found in section 39-810, R. R. S. 1943, exist in sections 2737 and 2738, Rev. St. 1913. The court ignores the distinction in the two acts.

There is one exception in section 2737, Rev. St. 1913, that requires notice—although the court ignores it. It is that the general powers of the county shall not extend to cities and villages having the power to establish boards of health and quarantine regulations. The court in the Bartlett case *denied recovery* for services to individuals resident in incorporated towns. Why? Because of the absence of the grant of power—and not because there was no provision of the statute that avoided the obligation. That denial rested on a lack of power in the county to incur the obligation.

Recovery in the Bartlett case was allowed as it was in Cheney v. County Board of Supervisors, *supra,* because there was a general power *with no statutory restriction on the exercise of the power.* In the instant case there are those mandatory restrictions on the exercise of the power. The court by its decision now holds them for naught except possibly to prevent the recov-

ery of the contract profits above resasonable value.

Do sections 23-336, 23-337, and 23-338, R. R. S. 1943, apply here?

The court says that the statute has no application where "the county has general authority to make the contract but the power has been irregularly exercised."

That is the ipse dixit of the court.

I examine first the history of the act and then our decisions construing and applying it.

The statute when passed was a new and not an amendatory act. Laws 1905, c. 55, p. 301. It is .entitled "FOR AN ACT to prevent the illegal expenditure of public funds."   .

It was introduced in the Legislature by Senator Laverty who represented Saunders and *Sarpy* Counties.   ·

Section 23-338, R. R. S. 1943, has a particular provision in a general act which excepts repairs to a bridge damaged by sudden casualty where there is a finding that an emergency exists and a notice of intention to repair is published. So somebody was thinking about bridges when this general act was passed.

It appears from the journal and the files in the Secretary of State's office that the bill as originally introduced applied to counties, cities, villages, and school districts and that the proviso above referred to was not a part of the bill as introduced.

The standing committee struck out everything after the enacting clause and reported the bill, limiting its operation to counties and putting in the proviso above referred to.

I have undertaken to find the background of the legislation. It appears from the briefs in the cases subsequently cited that a bridge was built across the river at Louisville by Cass County and one of its precincts. It got into disrepair.

In Dutton v. State ex rel. Pankonin, 42 Neb. 804, 60 N. W. 1042, Cass County by mandamus was required to repair the south half of the bridge.

State ex rel. Pankonin v. County Commissioners of Cass County, 58 Neb. 244, 78 N. W. 494, was a mandamus action to compel Cass County to repair the north half of the bridge. This was denied on the holding that the north half of the bridge was not in Cass but was in Sarpy County. That decision was filed on March 8, 1899.

In 63 Neb. 813, 89 N. W. 291, is the first of a series of opinions in County of Cass v. County of Sarpy.

That case was determined by the trial court on a demurrer. Cass County requested Sarpy County to enter into a joint contract for the repair of the bridge. Sarpy County refused. Cass County then had the bridge repaired and filed a claim with Sarpy County for one-half the cost. Sarpy County refused payment. An appeal was taken to the district court where a general demurrer was filed and sustained. On appeal on recommendation of the Commission (Department 3) the cause was reversed and remanded.

The statute involved is now as amended sections 39-827, 39-828, and 39-829, R. R. S. 1943. Sarpy County claimed that there had to be a contract under the statute before liability attached. The court held: "When a public bridge has been constructed across a stream dividing two counties, each county may be compelled, at the suit of the other, to contribute toward the expense of necessary repairs upon the same, although there may be no contract between the counties for the building or repair of the structure."

Cass County won the first round.

Sarpy County filed a motion for a rehearing.

A rehearing opinion is reported in 66 Neb. 473, 92 N. W. 635. Commissioner Ames wrote the majority opinion and in it expressed his dissenting views. The opinion recites that it had been urged that a consideration of other provisions of the statute "would be productive of a different result,"—and it was—temporarily!

The other provisions were sections 83, 84, and 85 of the code. Sections 4585, 4586, and 4587, Comp. St. 1901. They

became sections 5335, 5336, and 5337, Comp. St. 1903. As such they were repealed by an act in 1905. Laws 1905, c. 126, p. 539. The new act became sections 39-810 to 39-826, R. R. S. 1943,—the statute involved in this action. See history under section 39-810, R. R. S. 1943. So there became involved in this litigation the lineal ancestor of the present statute, section 39-810, R. R. S. 1943.

The opinion recites: "Sections 83, 84, 85 of the statute, *as construed by this court,* limit the power of counties to erect or repair bridges or approaches thereto, in instances in which the cost thereof shall exceed $100, by requiring contracts therefor to be let to competitive bidders after the adoption of the plans and specifications of the proposed works, and after notice of such letting by newspaper advertisement in a specified manner." Cass County v. Sarpy County, *supra.* (Emphasis supplied.) That is the construction for which I contend here.

Commissioner Ames stated the majority views with which he apparently disagreed. The opinion recites that "it was conceded that * * * a specific contract for the repairs in controversy had not been made" but were made pursuant to yearly contract for repairs. A majority of the commission, affirmed by the court, held that in order for plaintiff to recover, it was necessary to prove that the work was done pursuant to a specific contract, although Commissioner Ames held that it was "lawful work done in an irregular and unlawful manner." That is comparable to the view which the court now adopts.

As a result of that opinion the court receded from its earlier opinion and entered a judgment affirming the judgment of the trial court. The different result followed the consideration of what is now section 39-810, R. R. S. 1943.

Sarpy County won the second round.

Another motion for rehearing was filed—this time by Cass County.

A year later another opinion was filed, with Commissioner Ames again writing the opinion. 66 Neb. 476, 97 N. W. 352. The opinion recites that there was a diversity of opinion regarding the construction of sections 83 to 85, now section 39-810, R. R. S. 1943.

In between these two opinions Clark v. County of Lancaster, 69 Neb. 717, 96 N. W. 593, was decided. In the opinion in 66 Neb. 476, 97 N. W. 352, reference is made to Clark v. County of Lancaster and construed as holding that in the absence of a statute expressly or by necessary implication denying such right, one who furnishes labor and materials for the creation of a public work, in good faith, but in the absence of a contract such as is required by statute is entitled to recover their reasonable value.

The syllabus in the opinion in 66 Neb. 476, 97 N. W. 352, is: "One who furnishes labor and materials for the creation of a public work, in good faith, but in the absence of a contract such as is required by the statute, is entitled to recover their reasonable value, *in the absence of a statute expressly or by necessary implication denying such right.*" (Emphasis supplied.)

The judgment of November 19, 1902, was set aside and the judgment of the district court was reversed.

Cass County won that round.

Here I point out that the decision in the last opinion adopted the view now taken by the court *"in the absence of a statute expressly or by necessary implication denying such right."*

A motion for rehearing was filed by Sarpy County and denied in an opinion reported in 72 Neb. 93, 100 N. W. 197, and filed June 9, 1904.

Then what happened?

At the opening of the next session of the Legislature, Sarpy County's representative introduced the bill that resulted in the enactment of what are now sections 23-

336, 23-337, and 23-338, R. R. S. 1943. The statute declared that "all contracts either express or implied" and "all orders" etc. were "unlawful" and "wholly void as an obligation against any such county."

This is a statute meeting the requirements of the opinion in 66 Neb. 476, 97 N. W. 352, "of a statute expressly or by necessary implication denying such right" of recovery. The statute went further and provided that recovery could be had against county officials for funds paid out contrary to section 23-336, and further that "No judgment shall * * * be rendered by any court against any such county" in the absence of a statute expressly authorizing such a contract. Obviously sections 23-336, 23-337, and 23-338 were enacted directly to overcome the result of the final opinions in Cass County v. Sarpy County.

What more could the Legislature do to provide a statute expressly or by implication denying a right of recovery on such contracts or claims as are here involved? The court says here: "But where one is prohibited by statute from entering into a contract, and the *obligation of the contract avoided* for so doing, an action quantum meruit *cannot be maintained.*" (Emphasis supplied.)

I have here cited a statute, and its history, which the Legislature enacted specifically to overcome the court's construction of section 39-810, R. R. S. 1943, in the last of the Cass County v. Sarpy County cases.

Here I point out that in the recent case of Heese v. Wenke, 161 Neb. 311, 73 N. W. 2d 223, we held that: "* * * where there is a prohibition of power to contract coupled with a declaration of avoidance of obligation in the case of attempted exercise of power * * * there may be no recovery * * *." Here the only difference is that the statute of "avoidance of obligation" is an independent subsequent act, enacted for the specific purpose of meeting a situation such as we have here.

In the Wenke case the defendant was required to pay back because the statute avoided the obligation. Here

the statute says the obligation is wholly void—yet recovery by plaintiff is allowed.

It is to be remembered that the basis of liability against Sarpy County was what are now sections 39-827 to 39-830, R. R. S. 1943. The statute under which the liability was finally determined was what is now section 39-810, R. R. S. 1943. The Legislature sought, as it expressed it, to reach "all contracts, either express or implied," etc., hence used an independent bill and not one amendatory of either sections 39-827 to 39-830, R. R. S. 1943, or section 39-810, R. R. S. 1943.

Cass County v. Sarpy County, 90 Neb. 709, 134 N. W. 270, was an appeal involving this same matter. The cause was tried to a jury and judgment was for the defendant. We reversed and remanded.

Why?

Two contentions as to the sufficiency of the evidence were raised as to two separate issues. One was as to whether or not the bridge was a part of a public highway. The other was whether the bridge was repaired or a new one built. We held that if the verdict turned on the second fact question that it was not sustained by the evidence.

But the court held because "no special findings were submitted to and returned by the jury, it is impossible to say upon which of these two points the verdict of the jury was based. * * * Being unable, as above indicated, to determine upon what theory the jury returned their verdict, it should not, *in the face of the apparent merit of the plaintiff's claim,* be permitted to stand."

I quote this case here at the end of the Cass County series because it illustrates one of my objections to the "equivalent to the verdict of a jury" rule upon which the court relies. In this last Cass County case there were no special findings and there was no evidence to sustain one theory upon which the verdict might have rested. Because we were unable to determine upon what fact basis the jury's verdict rested, we reversed.

In the instant case there were "no special findings" by the court; it is "impossible" to determine upon what fact "theory" the trial court found for the plaintiff; nevertheless because the court finds some evidence that would sustain $a$ theory upon which the trial court's finding possibly could rest, we affirm.

Under the rule stated in syllabus No. 1 here, had Cass County v. Sarpy County, 90 Neb. 709, 134 N. W. 270, been tried to the court without a jury resulting in a judgment for the defendant, it would have been affirmed "in the face of the apparent merit" of the claim. Consideration of evidence rules in this court that produce such diametrically opposite final results cannot be justified.

I now go to some of our decisions where sections 23-336, 23-337, and 23-338, R. R. S. 1943, have been involved and construed so far as important here.

It seems that Buffalo County and Kearney County have also had bridge troubles on a boundary river. See Buffalo County v. Kearney County, 95 Neb. 439, 145 N. W. 985. One was involved in Standard Bridge Co. v. Kearney County, 95 Neb. 744, 146 N. W. 943. It was claimed that the contract was void because it was let without advertising for bidders. It was stipulated that an emergency existed. It was held that whether or not an emergency existed was a serious question under the evidence but "in this court on appeal * * * the stipulation of facts is the only evidence that we can consider." There was a beautiful opportunity to have applied the "equivalent to a jury verdict" rule. But it was not applied. The court examined the controlling fact situation and held that advertisements for bids were not required because of the emergency. That rested on the proviso of section 23-338, R. R. S. 1943. It was further contended that there had to be at least one publication of notice of intent to repair. That question had not been raised in the trial court. We held: "A case on appeal rests upon the issues tendered and finally determined in the district court." I cite the case here

principally because of its bearing on the matters earlier discussed herein.

Gibson v. Sherman County, 97 Neb. 79, 149 N. W. 107, involved a claim for two items of bridge material totaling $512.24. No "bookkeeping practice" was involved. The claim was denied under section 23-336, R. R. S. 1943, in that there "were no funds legally available therefor." The Legislature then enacted Laws 1909, chapter 178, page 598, authorizing payment. The trial court denied the payment of the claim. On appeal here we held that the special act authorizing payment was constitutional, and reversed and remanded. The decision rests on the validity of the special act as removing "the bar to the remedy." The application of section 23-336, R. R. S. 1943, to this situation (comparable to the one here) was conceded—otherwise it would not have been necessary to get or for this court to rely on the special act.

Judge Letton, dissenting, went to the validity and purpose of sections 23-336, 23-337, and 23-338, R. R. S. 1943. He held: "The act of 1905 was evidently designed to put upon inquiry every person who thereafter dealt with a county board or board of supervisors as to the legality of the proposed contract. It was a direct notification that, unless the contract was authorized, was not in contravention of any statutory limitations, and there were funds legally available at the time, it should be 'wholly void as an obligation against said county.' The purpose of the statute is beneficial. In my opinion it should be obeyed by this court, as well as by all other courts in the state." Gibson v. Sherman County, *supra*.

Judge Letton in the conclusion obviously was referring to section 23-338, R. R. S. 1943, which bars a judgment "by any court" where material is contracted for in "contravention of any statutory limitations" as it was in the Gibson case and as it is here. The majority did not join issue with Judge Letton.

So far as matters such as are involved here are concerned, when the court's opinion here becomes final, the legal situation will be just where it was when Cass County v. Sarpy County was finally decided. The Legislature moved to correct the effect of that opinion. The act of 1905 is now put aside and is a nullity so far as matters of this kind are concerned. The situation is now as though that act had not been passed. The Legislature declared transactions such as this to be "void as an obligation" against a county; it declared that funds paid out could be recovered from the officers making the payments; and it provided that no court should render judgments against a county. These provisions were directed at "all contracts either express or implied, * * * in contravention of any statutory limitation, * * *." The Legislature did not say, "provided this act shall not be effective where granted powers have been 'irregularly exercised.'"

This court said that in the Cass County v. Sarpy County decisions. The Legislature in 1905 undertook to avoid such an avenue of escape from the effect of an "illegal or irregular" act. The court now again opens the avenue to liability.

The Legislature may once again enact a law "to prevent the illegal expenditure of public funds." I think doing so once should be sufficient, but evidently it is **not** so.