GEORGE O. BARNES ET AL., APPELLEES, v. JOHN L. DAVITT, APPELLANT.

71 N. W. 2d 107

Filed June 17, 1955. No. 33745.

*Thomas W. Lanigan,* for appellant.

*Lanigan & Ondracek* and *Harold E. Connors,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, George O. Barnes and Louis V. Barnes, originally filed this forcible entry and detainer action in the county court of Greeley County on May 11, 1953, against defendant John L. Davitt, seeking restitution of described land owned by plaintiffs in said county. In that court, upon trial to a jury of issues made by plaintiffs' complaint and defendant's plea of not guilty and his special plea hereinafter set forth, the jury returned a verdict finding defendant guilty as charged and judgment was rendered thereon for plaintiffs, costs taxed to defendant. Therefrom defendant appealed to the district court, where the cause was tried to the court, jury waived, upon the issues as made by plaintiffs' complaint filed in the county court and defendant's pleas thereto. At conclusion of all the evidence, the trial court found and adjudged that defendant was guilty as charged, and taxed costs to defendant. Thereafter defendant's motions to vacate the judgment and render judgment for defendant and for a new trial were overruled. Therefrom defendant appealed to this court, assigning that the trial court erred in rendering such judgment and overruling his motions. We conclude that the assignments should not be sustained.

Plaintiffs' complaint alleged that they were the owners in fee simple of the described land involved, and that on or about May 3, 1953, defendant unlawfully, forcibly, and without their consent, entered the premises and unlawfully detained possession thereof; and that on May 5, 1953, they duly served upon defendant a written 3-day notice to vacate, which period had fully elapsed,

yet defendant continued to unlawfully and forcibly detain possession of the premises. They prayed for restitution and costs.

Thereto defendant filed a plea of not guilty and as a special plea alleged that the described land was enclosed by a fence and had been used by him for pasturage purposes for a number of years under oral lease from the former owner, one Harry J. Rooney; that in February 1951, a rental of $625 cash rent therefor was agreed upon and paid, and defendant held over for the year 1952 and paid the same rent under the February 1951 agreement; that defendant had possession of and used the premises up to the present time and claimed the right to possession for 1953 as a holdover tenant from year to year; that no 6-months' notice to vacate or terminate his tenancy was served upon him as required by law; and that on or about April 16, 1953, he tendered the 1953 rent to Rooney, but it was refused. Defendant further alleged that on or about May 1, 1953, pursuant to custom which he had followed for many years, he lawfully repaired the fences and wells, and on or about May 3, 1953, he peacefully and lawfully ran some of his livestock on the land and is now in lawful possession thereof, using the same for pasturage purposes. He prayed for dismissal of plaintiffs' complaint. We have summarized defendant's pleas at length because, as hereinafter observed, his own testimony as well as the evidence adduced by plaintiffs, is in conflict therewith in several material respects.

In Borcherding v. Eklund, 156 Neb. 196, 55 N. W. 2d 643, this court held: "In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom."

In Curry v. Bruns, 136 Neb. 74, 285 N. W. 88, we held: "When the facts pertaining to the relationship of the per-

sons involved are in dispute, or more than one inference can be drawn therefrom, the question is for the jury."

As held in Snyder v. Farmers Irr. Dist., 157 Neb. 771, 61 N. W. 2d 557: "It is not the province of this court in reviewing the record in an action at law to resolve conflicts in or weigh the evidence." Further, in Scottsbluff Nat. Bank v. Blue J Feeds, Inc., 156 Neb. 65, 54 N. W. 2d 392, we held: "Findings of a court in a law action in which a jury is waived have the effect of the verdict of a jury, and judgment thereon will not be disturbed unless clearly wrong."

Section 27-1401, R. R. S. 1943, provides a remedy "as well against those who make unlawful and forcible entry into lands and tenements, and detain the same, as against those who, having a lawful and peaceable entry into lands or tenements, unlawfully and by force hold the same; * * *."

In Critchfield v. Remaley, 21 Neb. 178, 31 N. W. 687, this court held: "Where lands are leased to a tenant for one year for a stipulated rent reserved, and after the expiration• of the lease the tenant, without further contract, remains in possession, and is recognized as a tenant by the landlord, in the receipt of rent for another year, this will create a tenancy from year to year.

"In such case the tenancy can only be terminated by the agreement of the parties, express or implied, or by notice given, six calendar months ending with the period of the year at which the tenancy commenced." See, also, Farley v. McKeegan, 48 Neb. 237, 67 N. W. 161.

Also, in Pusey v. Presbyterian Hospital, 70 Neb. 353, 97 N. W. 475, 113 Am. S. R. 788, this court held: "A tenancy from year to year will not be created against the contrary intention of both parties, landlord as well as tenant, and the payment of rent is merely an evidential fact bearing upon the question of the intent of the parties. Johnson v. Foreman, 40 Ill. App. 456."

Further, in State v. Cooley, 156 Neb. 330, 56 N. W. 2d

129, we said: " 'It is generally held that if, after the expiration of a lease, the tenant pays rent and the landlord accepts the payment, the lease is extended. The extended term is usually said to be from year to year, although it is probable that in most cases it is meant that such a term results when the lease is for a year or for years. It has been generally ruled, however, that there is only a presumption of a tenancy from year to year arising from a holding over and that such presumption, or implication of the law as it is sometimes called, is rebuttable. It is rebuttable by showing that such a tenancy was not the intention of the parties or that they had entered into a contrary agreement.' 32 Am. Jur., Landlord and Tenant, § 940, p. 792.

"In West v. Lungren, 74 Neb. 105, 103 N. W. 1057, we quoted the following from Montgomery v. Willis, 45 Neb. 434, 63 N. W. 794: ' "Such a tenancy will be presumed where a tenant remains in possession after the expiration of his term, and his tenancy is recognized by the landlord, where no new contract was made. Critchfield v. Remaley, 21 Neb. 178. This rule is, however, only a rule of presumption, and the presumption is rebutted by proof of a different agreement, or of facts inconsistent with the presumption. Shipman v. Mitchell, 64 Tex. 174; Williamson v. Paxton, 18 Gratt. (Va.) 475; Grant v. White, 42 Mo. 285; Secor v. Pestana, 37 Ill. 525." ' " See, also, Corcoran v. Leon's, Inc., 126 Neb. 149, 252 N. W. 819.

In Miller v. Maust, 128 Neb. 453, 259 N. W. 181, citing numerous authorities, including Brown v. Feagins, 37 Neb. 256, 55 N. W. 1048, and Tarpenning v. King, 60 Neb. 213, 82 N. W. 621, this court held: "In an action of forcible entry and detainer, the ground of complaint is that the entry and detention were unlawful and forcible, absolute ownership or a possessory right not being a defense.

"In an action of forcible entry and detainer, the character of the entry and detention is the test of plain-

tiff's right to recover, where the complaint charges that defendant's possession was obtained and held forcibly.

"One purpose of the act empowering a justice of the peace to determine the issue in an action of forcible entry and detainer is to prevent even rightful owners of realty from taking the law into their own hands and recovering by violence what the remedial powers of a court would grant."

In the light of the foregoing rules we have examined the record. The material and relevant evidence adduced by plaintiffs may be summarized as follows: One Harry J. Rooney was the owner of 771 acres of sandhill pasture land about 3 miles west of Greeley. He had been the owner thereof since about 1943. From 1944 through 1952 he had orally leased the land to defendant for only the pasture season, May 1 to October 1 of each year. There is no evidence in this record of any agreement that defendant ever leased the land from March 1 to March 1 of any year. The rental therefor was for cash, and each year Rooney and defendant made a new agreement for such a lease. The rental contract price for this period was always by negotiation and differed for each year, except that it was the same for 1951 and 1952. In that respect, defendant's checks for payment of rent, offered by him and received in evidence marked "pasture rent," and oral evidence as well, corroborrates that fact.

The land was fenced and had two wells and two windmills upon it. Concededly, in accord with their agreements, Rooney was required to and did until 1953 repair the fences before May 1 each year and keep them in repair. Concededly also, Rooney was required to and did until 1953 at or about the same time each year hook up the windmills and keep them and the wells in repair. When that was done defendant would put his livestock in the pasture until about October 1, when he would remove them. Concededly Rooney, as required, did at that time each year until 1953 go on the

land, drain the water tanks, and unhook the windmills.

During the summer of 1952 Rooney decided to and did rent the land for the 1953 pasture season to one James Dugan for $1,000, with the privilege of purchasing the land at $30 an acre. At once, on September 8; 1952, Rooney so notified defendant in writing. In January 1953, Rooney decided to sell the land. He placed it in the hands of a broker, and leased other land to Dugan. However, before the land was sold, Rooney gave defendant, who owned adjacent land, an opportunity to buy it, which defendant refused to accept. When that was done, Rooney sold 209 acres of the land to Elmer L. Olson and Marjorie Davis Olson. Their agreement to do so, executed February 14, 1953, contained provision for possession by March 1, 1953. A warranty deed therefor was duly executed and delivered to the Olsons. Rooney also sold 320 acres of the land to plaintiffs. The agreement to do so, executed on February 12, 1953, contained a provision for possession on or before March 1, 1953. A warranty deed therefor was duly executed and delivered to plaintiffs. The rest of the 771 acres was then sold to one Mr. Dutcher, not involved in this action.

The three purchasers then not knowing that defendant claimed any right of possession, went into possession of the land, which was not then occupied by defendant. Thereon they built division fences between their lands, and plaintiffs staked out a well spot and repaired the fences between their land and defendant's adjoining land. Such fence was completed on or about Easter Sunday of 1953.

Thereafter, on April 16, 1953, defendant tendered $625 to Rooney as the pasture rent for 1953, which was refused. Then on April 20, 1953, defendant's counsel notified Rooney, Olson, Dutcher, and plaintiffs in writing that defendant claimed possession of described land under a lease with Rooney from year to year, and he intended to retain possession for 1953. The description

of the land involved was not complete, so on April 27, 1953, defendant's counsel completed the description and included therein another such notice to them in writing. Thereafter, on May 1, 1953, Rooney notified defendant's counsel in writing that if defendant trespassed upon or let his cattle run upon the land that summer, proper legal means would be taken to stop it. Nevertheless, on or about May 3, 1953, defendant took down the line fence between his land and plaintiffs, kicked down the fences between plaintiffs' land and Dutcher's land, and put about 100 head of his cattle on the land. Defendant then for the first time since 1944 hooked up the windmills, which were on Olsons' land. Concededly, if defendant had a lease from year to year, no proper 6-months' notice to vacate was given him. However, concededly, on May 5, 1953, a proper written 3-day notice to vacate was served upon defendant, who refused to vacate, and this action was commenced.

Defendant's evidence was directly conflicting with that adduced by plaintiffs in several material respects. He testified that he owned 880 acres of pasture land adjoining Rooney's, and dealt with Rooney beginning in 1944 when he rented the land for "additional pasture" and had a "continuous agreement for the pasture." He claimed that he had a gate in one corner and a let-down in the fence at a more accessible point, and that, having a year to year lease, and according to custom, he ran his cattle back and forth the year around. He admitted that Rooney was required to and did hook up the windmills and repair the wells and fences in April of each year, and did unhook the windmills about October 1 of each year. However, he claimed that after October 1 his cattle came from the land involved up to his own land for water. He claimed that when Rooney sold the land he had possession and continued to have possession of it. He admitted, however, that he took down Dutcher's fence, let down the fence between his land and plaintiffs, and put his cattle in there on May 3,

1953, as claimed by plaintiffs; and that his hired man then went down and turned on the windmills. Defendant denied that he had ever leased the land from May 1 to October 1 of each year, and denied that the terms of the lease were ever changed except for the amount of the rent. In that connection, however, he was asked: "Q. And was there any agreements about months on pasture, months or anything with Rooney made? A. Not that I know of."

Defendant's hired man, so employed during the last 3 years, was asked, referring to defendant: "Q. During those three years do you know whether he run his cattle the year around in this pasture, the land in controversy here? A. Nothing to stop him. They could go back down there. Q. Did they go back down there? A. Part of the time. * * * Q. And then the cattle would go up to Davitt's tank and drink and go back down anytime of the year? A. Yes, they could go to Davitt's well. Q. And that has been going on since you have been there? A. Yes, sir, nothing to stop them." Contrary to plaintiffs' evidence and defendant's own testimony as well, he testified that the fence was in bad repair and already down when defendant's cattle were put upon the land on May 3, 1953, but admitted that he then kicked the fence down between Dutcher's land and plaintiffs' land.

A witness for defendant who rented for cash rent by the year testified that he lived 12 miles north of Greeley, up near the river, and that in that country grama grass will not grow on sandhills, but grows in the valleys where there is clay bottom, and if not eaten down in summer it was all right and customary to pasture it in winter. Another witness for defendant, who lived 12 miles north of Greeley, testified that he did not know the land involved, but his lessee of sand pasture puts his cattle in about the middle of June and leaves them in until it freezes up and becomes inconvenient to take care of them for winter, at which time

the lessee takes them home until the next spring.

One of the plaintiffs, in rebuttal, testified that on Easter Sunday, 1953, when the fencing had been completed, all of the fence between plaintiffs and defendant was up, with horses on defendant's side thereof. Another witness, who lived at Greeley and owned pasture land 6 miles north of Greeley, testified for plaintiffs in rebuttal that he leased land for the pasture season, May 1 to October 1, and according to general practice his cattle were never put back in after October 1, although he had seen cattle in pastures the year around.

In the light of such evidence and the rules of law heretofore set forth, we conclude that the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.