ROY B. FISHER, APPELLANT, V. CHARLES S. STUCKEY ET AL., APPELLEES.

267 N. W. 2d 768

Filed July 19, 1978. No. 41608.

Jess C. Nielsen of Crosby & Nielsen, for appellant.

C. Kenneth Spady and William P. Mueller of Mc-Ginley, Lane, Mueller, Shanahan & McQuillan, and Baskins & Rowlands, for appellees.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and FAHRNBRUCH, District Judge.

BRODKEY, J.

The issue presented in this case is whether a tenant was entitled to harvest crops which he planted on leased farm land before his lease expired, but which had not matured on the date the lease expired, at which time possession of the land was given to a successor tenant. Roy B. Fisher, the tenant, filed this action against Charles S. and Frank R. Stuckey, the landlords, and Douglas Welch, the successor tenant, alleging the defendants had deprived him of his interest in a wheat crop he had planted before his lease expired, by destroying the growing crop shortly after his leasehold terminated and Welch had taken possession of the land. Defendants denied Fisher had any interest in the crop. Frank R. Stuckey died while the case was pending in the District Court, and the action against him was revived

against the personal representative of his estate. Defendants moved for summary judgment, which motions were granted by the trial court. Fisher has appealed to this court, contending that the trial court erred in sustaining defendants' motions for summary judgment because there were genuine issues of material fact existing in this case.

The facts relevant to this appeal are as follows. The farm land in question is located in Lincoln County, Nebraska, and was formerly owned by Virginia Lucy Barrett, deceased, an aunt of the Stuckeys. In 1957 Fisher, as tenant, entered into a written, 1-year lease of the land with the estate of Virginia Lucy Barrett, pursuant to which he was entitled to possession from March 1, 1957, until February 28, 1958, and which lease by its own terms expired on the latter date. Fisher agreed to pay as rent one-third of the crops grown on the land plus the sum of $250. Three provisions pertinent to this appeal were contained in the written lease:

"4. * * * any summer fallow of any part of said leased premises shall under no consideration be considered as part performance for the creation of any new lease * * *.

"10. No action of either party hereto shall be considered an extension of this lease, nor will any extension of time be binding upon either party unless made in writing and signed by all of the parties hereto.

"14. Second party [lessee] is to retain possession of ground summer fallowed by him until the crops planted by said second party be harvested."

Although Fisher continued to lease the land from 1957 until March 1, 1973, he executed no written lease other than the one described above. In 1959, Frank and Charles Stuckey took possession of the land, having inherited it from Virginia Lucy Barrett. In his deposition, Charles testified that he was not aware of the written lease until 1972. He also testi-

fied that the Stuckeys had leased the land to Fisher under oral, year-to-year leases, which ran from March 1st to March 1st. Fisher acknowledged he had never executed a written lease with the Stuckeys or extended the 1957 lease in writing. Fisher could not recall discussing the 1957 lease with the Stuckeys.

In February 1972, Charles Stuckey decided to combine the land he leased to Fisher with other land he owned for the purpose of enhancing benefits under ASCS (Agricultural Stabilization and Conservation Service) programs. Charles Stuckey testified he wrote Fisher on February 26, 1972, advising him that he was requesting Douglas Welch, who leased the other land, to consider assuming the responsibility for the combination. He also testified that in early March 1972, he orally advised Fisher that Fisher's tenancy would expire on March 1, 1973, and that Fisher should not summer-fallow and plant crops in the fall of 1972. Subsequently Fisher and Stuckey entered into negotiations concerning use of the leased premises in 1972, but no agreement between them was ever reached.

However, it is undisputed that in August 1972, Stuckey sent Fisher three written notices to terminate Fisher's lease. Fisher acknowledged receiving notices which advised Fisher that his lease would terminate on March 1, 1973; that Fisher would not be permitted to reenter the premises after that date for any reason whatsoever; and that any crops planted before March 1, 1973, but not matured as of that date, would be planted at Fisher's risk and Fisher would not be permitted to reenter the premises to harvest such crops. Fisher received these notices in August 1972, but chose to plant a crop of wheat subsequent to receiving them, knowing that the crop would not mature until June 1973.

On September 6, 1972, Stuckey and Welch executed a 2-year written lease of the land running from March 1, 1973, until March 1, 1975. On March 1,

1973, Welch took possession of the premises. A short time later he destroyed the wheat crop Fisher had planted by tilling the soil and planting milo in its stead. Charles Stuckey testified in his deposition that he was unaware of Welch's plans, and did not learn of the destruction of the wheat crop until after it occurred. Fisher confronted Welch, but was advised that Fisher had no interest in the land or wheat because his lease had expired. This action ensued.

The central issue in this appeal is whether summary judgment was properly granted to the defendants on the facts presented. This necessitates an examination of the rules applicable to summary judgments. It is well-established in this jurisdiction that the moving party is not entitled to summary judgment except where there exists no genuine issue as to any material fact in the case and where under the facts the movant is entitled to judgment as a matter of law. The issue on a motion for summary judgment is whether or not there is a genuine issue as to any material fact, and not how that issue should be determined. In considering such a motion, the trial court must take that view of the evidence most favorable to the party against whom summary judgment is directed, giving to that party the benefit of all favorable inferences that may reasonably be drawn from the evidence. Reeves v. Associates Financial Services Co., Inc., 197 Neb. 107, 247 N. W. 2d 434 (1976); Green v. Village of Terrytown, 189 Neb. 615, 204 N. W. 2d 152 (1973). Summary judgment is not appropriate even where there are no conflicting evidentiary facts if the ultimate inferences to be drawn from those facts are not clear. Barnes v. Milligan, 196 Neb. 50, 241 N. W. 2d 508 (1976). These rules, of course, must be applied to this case.

The principal issues raised in this appeal are (1) the nature of the lease under which the plaintiff was in possession of the premises in question, that is

whether it was a written lease or an oral lease, and the terms thereof; (2) whether proper legal notice was given to terminate such lease; (3) whether the defendants' subsequent lease to the new tenant, Douglas Welch, was subject to the right of the plaintiff to harvest the wheat planted by him; and (4) whether the plaintiff was entitled to rely upon the custom in the community as to leasing, seeding, and harvesting summer-fallowed ground and way-going crops in the absence of a showing in the record that plaintiff pled that issue or introduced any evidence in support thereof. A further issue raised by plaintiff, but not strongly pressed by him, is whether the defendants were guilty of a civil conspiracy against him.

An examination of the record before us convinces us that the trial court was correct in sustaining the motions of the defendants for summary judgment, and we affirm its order to that effect.

The evidence is undisputed that the plaintiff was in continuous possession of the premises in question as a tenant from 1957 until 1973, when the new tenant, Douglas Welch, took possession, and farmed the property during that entire period. The only written lease involved herein was the one under which he originally went into possession in 1957, which lease was executed by the executor of the estate of Virginia Lucy Barrett, who was the aunt of Charles Stuckey and Frank Stuckey, who inherited the land from her. The estate was closed in 1960. As previously stated, the original written lease was for a term of 1 year to commence on March 1, 1957, and end on February 28, 1958. The lease specifically provided that no extension of time would be binding upon either party unless made in writing and signed by all the parties thereto. It also provided that the lessee, Roy B. Fisher, was to retain possession of ground summer-fallowed by him until the crops planted by him were harvested. The evidence is un-

contradicted that there were no extensions of the written lease in writing thereafter, to and including the year 1973. Plaintiff contends that Charles and Frank Stuckey, the only heirs of Virginia Lucy Barrett, by words and actions ratified the original written lease, and that he was a hold-over tenant on the same terms, conditions, and provisions contained in the original written lease, including the provision entitling him to retain possession of ground summer-fallowed by him until the crops planted by him were harvested. We find this argument to be without merit, as it ignores the specific provision in the 1957 written lease requiring any extensions thereof be in writing and signed by all the parties. This was not done. We conclude, therefore, that defendants are correct in their contention that plaintiff's possession of the premises subsequent to the 1957 written lease, was as a year-to-year tenant. It has long been the law in this jurisdiction that where lands are leased to a tenant for 1 year for a stipulated rent reserved, and after the expiration of the lease the tenant, without further contract, remains in possession, and is recognized as a tenant by the landlord in the receipt of rent for another year, this will create a tenancy from year-to-year; and in such case the tenancy can only be terminated by an agreement of the parties, express or implied or by notice given, 6 calendar months ending with the period of the year at which the tenancy commenced. Critchfield v. Remaley, 21 Neb. 178, 31 N. W. 687 (1887). See, also, Barnes v. Davitt, 160 Neb. 595, at p. 598, 71 N. W. 2d 107 (1955). In his deposition received in evidence at the hearing on summary judgment, defendant Charles Stuckey testified that Fisher farmed from him under an oral lease, a conventional oral lease. He was asked to state what the terms of that oral lease were and he replied: "Well, that oral lease consisted of the crop shares, a two-thirds to the tenant of the grains, one-third to the landlord, the same proportion of ex-

pense, fertilizer, and cash rent for pasture which was orally negotiated from time to time.'' Nothing is stated therein with reference to any right of the tenant to enter after the termination of his tenancy and harvest crops previously planted by him.

We now consider the question of whether plaintiff's oral year-to-year lease was properly and legally terminated. Defendant, Charles Stuckey testified that Fisher had both official and unofficial notification of the termination of his current oral lease as of March 1, 1973. He testified that the unofficial notification was by a letter dated February 26, 1972, to the plaintiff and also by subsequent oral conversations. The letter referred to, received in evidence, is subject to interpretation, and it is doubtful whether it, in fact, gave plaintiff notice that his tenancy was to be terminated. The evidence, however, is uncontradicted that plaintiff received three formal legal notices of termination, dated August 8, 1972, August 21, 1972, and August 28, 1972, all of which were within the requisite 6-month period. The last of the three notices referred to made particular reference to the effect that if Fisher planted any crop on the premises which matured after March 1, 1973, he would be planting such crop at his own risk and he would not be permitted to enter the premises for the purpose of harvesting such crop after March 1, 1973. In his deposition, plaintiff, Roy B. Fisher, admitted being told by the defendant he was not to summer-fallow or plant in the fall of 1972. He testified as follows: ''Q. Was there anything after receipt of this letter [letter of February 26, 1972] saying that you were not to summer fallow in '72? A. Yes. Q. Was there anything said that you were not to plant during '72?. A. That's right, they said I wasn't to plant. Q. And, you're not to summer fallow; correct? A. Right.'' It is clear that Fisher received the written notices terminating his tenancy in August 1972, but chose to plant a crop of wheat subsequent to receiv-

ing them, knowing that the crop would not mature until 1973, and also knowing that he had been previously directed and warned not to summer-fallow in 1972.

We believe the facts of this case are analogous to and governed by Peterson v. Vak, 160 Neb. 450, 70 N. W. 2d 436, (1955), as modified, 160 Neb. 708, 71 N. W. 2d 186 (1955), hereinafter referred to as Peterson (1955). See, also, Peterson v. Vak, 169 Neb. 441, 100 N. W. 2d 44 (1959), hereinafter referred to as Peterson (1959). In Peterson (1955), the tenant possessed land by virtue of an oral lease which ran from March 1st to March 1st, and was a tenant from year-to-year from 1918 until March 1, 1952. In August 1951, the landlord served a written notice on the tenant terminating his tenancy as of March 1, 1952. The landlord then entered into a lease with a successor tenant, said lease commencing on March 1, 1952. The tenant disregarded the notice given him in August 1951, and planted wheat in September 1951. In 1952, after his lease had expired, the tenant claimed the right to reenter the land to harvest the wheat. The successor tenant brought an action to bar the tenant from claiming any interest in the wheat.

This court found that the tenant "had an absolute right to till, plant wheat, and use the land until March 1, 1952, but he was charged with knowledge that his status in reference to it would on that date completely and finally terminate and any crop planted that did not mature or was not disposed of by him before that date would be his loss." The court relied on Vance v. Henderson, 141 Neb. 766, 4 N. W. 2d 833 (1942), and Fenster v. Isley, 143 Neb. 888, 11 N. W. 2d 822 (1943), cases with similar facts holding that a tenant from year-to-year is not entitled to reenter the premises after his lease expires to harvest crops planted before his lease expired when he was on notice of the date the tenancy would expire before he planted the crops. The rule in Pe-

terson (1955) was reaffirmed in Peterson (1959). In the present case, the defendants rely on Peterson (1955) as controlling.

Fisher relies on Schuler-Olsen Ranches, Inc. v. Garvin, 197 Neb. 746, 250 N. W. 2d 906 (1977), (hereinafter referred to as Schuler-Olsen). In that case the tenant had a 3-year, written lease which was to terminate on March 1, 1974, and which contained no provision concerning the possession of crops planted during the lease term but not ready for harvest when the lease expired. The tenant planted wheat in the fall of 1973. In October 1973, the landlord contracted to sell the land to a third party, after negotiations to sell the land to the tenant had failed in September 1973. There was evidence that during those negotiations the landlord assured the tenant that the tenant was entitled to his share of the wheat he had planted. When the wheat was ready for harvest in July 1974, a dispute arose between the tenant and the new owner concerning possession of the wheat.

In Schuler-Olsen, in addition to the evidence that the landlord had agreed with the tenant that the tenant was entitled to his share of the wheat, there was evidence that the custom in the area was that a tenant was entitled to harvest wheat which he summer-fallowed and planted, even though the lease would expire before it was ready for harvest. This court concluded that there was sufficient evidence to support the District Court finding that under the lease agreement, and under customary farm practices, the tenant was entitled to his share of the wheat. This court did not cite or discuss either of the Peterson cases in its opinion and did not purport to alter the rule of those two cases.

Fisher argues that this court in effect modified Peterson (1955) when it decided Schuler-Olsen. We do not believe it did in view of the fact that Peterson (1955) involved a written lease and there was no

claim by the tenant that he was entitled to the way-going crops pursuant to an oral agreement of the parties. In Schuler-Olsen the tenant did contend, although the written lease was silent on the issue, that he was entitled to the crops under the lease as well as under custom. Schuler-Olsen merely holds that where the written lease agreement is silent on the issue of way-going crops, a party may be entitled to prove whether the parties nevertheless had an agreement concerning such crops or whether they contracted with a community custom in mind. Peterson (1955) does not reach those issues.

Fisher contends that a trial is necessary to determine whether the parties relied on custom, and whether under custom Fisher is entitled to the way-going crops. "It is ordinarily incumbent upon one who relies on a special custom as a basis of recovery or defense to allege the custom and to plead and prove the other party had knowledge of the custom and contracted with reference thereto." Timmerman v. Hertz, 195 Neb. 237, 238 N. W. 2d 220 (1976). In the present case, Fisher did not allege the custom on which he relies, nor did he plead that the Stuckeys had knowledge of the custom and contracted with reference thereto. In view of this fact, we conclude that Fisher has failed to properly raise the issue of custom in this case, and reject his contention that a trial is necessary to resolve the custom issue.

We have examined the other assignments of error and issues of the plaintiff in this appeal, including his contention as to the existence of a civil conspiracy by the defendants against the plaintiff, and find them to be without merit. We conclude that under the facts of this case, as revealed by the record, and the applicable law, that the trial court was correct in entering summary judgment for the defendants, and that the judgment of the trial court should be, and hereby is affirmed.

AFFIRMED.

BOSLAUGH, J., concurs in the result.